ams

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 09-4104-JAR |
| AFFILIATE STRATEGIES, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM AND ORDER

This is a consumer protection action against several individual and corporate defendants for their roles in marketing and selling to consumers grant-related goods and services upon allegedly false representations that the consumers were guaranteed or likely to receive grants and for follow-up  based on the same or similar deceptive representations.  Plaintiffs Federal Trade Commission ("FTC"), and State of Kansas, State of North Carolina, State of Illinois, and State of Minnesota brought this action for violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41–58, 6101–6108; the Telemarketing Sales Rule, 16 C.F.R. Part 310 ("TSR"); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, *et seq*.; the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq*.; the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-325D.48, 325F.67; the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68-325F.70, 325F.71, subd. 2; and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq*.

Plaintiffs brought this action against the following defendants: Affiliate Strategies, Inc.,

Apex Holdings International, LLC, Answer Customers, LLC, Grant Writers Institute, LLC ("GWI"), Landmark Publishing Group, LLC ("LPG"), and Direct Marketing Systems, Inc. (collectively "the Kansas Corporate Defendants"); Brett Blackman, Jordan Sevy, and James Rulison (along with the Kansas Corporate Defendants, "the Kansas Defendants"); Real Estate Buyers Financial Network, LLC ("REBFN"), Martin Nossov, and Alicia Nossov (collectively "the North Carolina Defendants"); Wealth Power Systems, LLC ("WPS"), Aria Financial LLC ("Aria"), and Justin Ely (collectively "the Utah Defendants"); and Meggie Chapman.  A Clerk's Entry of Default has been entered against all of the Kansas Corporate Defendants.  The following defendants have settled with plaintiffs and permanent injunctions have been approved by the Court: Brett Blackman, Jordan Sevy, James Rulison, and Justin Ely.  The following defendants have signed permanent injunctions that, if accepted by plaintiffs and approved by the Court, would settle the case against them: WPS and Aria. Therefore, Counts I, VI, and XVI are moot because they pertain only to the Kansas Defendants.  Plaintiffs do not separately discuss Counts VIII and XII, claims under Kansas and Minnesota law.  Accordingly, to the extent plaintiffs' motion includes these claims, summary judgment will be denied.

Before the Court are plaintiffs' Motion for Summary Judgment (Doc. 310) against the remaining defendants,[1] and Meggie Chapman's Motion for Summary Judgment (Doc. 301).  As described more fully below, the Court grants in part and denies in part plaintiffs' motion for summary judgment.  The Court denies Chapman's motion for summary judgment.

## I.    Procedural History

---

[1] Plaintiffs' motion for summary judgment includes the Utah Defendants.  The Court was notified about the settlement with Ely and the pending settlements with WPS and Aria after this motion became fully briefed.  The Court, therefore, finds that plaintiffs' motion for summary judgment against the Utah Defendants should be denied as moot, without prejudice.  Likewise, WPS and Aria's motion for summary judgment (Doc. 308) is denied as moot, without prejudice.

This case was originally filed on July 20, 2009, by the FTC and the States of Kansas, Minnesota, and North Carolina. The Court issued a Temporary Restraining Order ("TRO") against the Kansas-based defendants on July 24, 2009, which, among other features, prohibited their on-going misrepresentations, appointed a Receiver over the Kansas Corporate Defendants, and imposed a freeze on the corporate assets.[2] On September 1, 2009, the Court entered a Stipulated Preliminary Injunction that continued the relief granted in the TRO.[3]

On December 1, 2009, the Court granted the original plaintiffs' Motion to Amend the Complaint. The (First) Amended Complaint added the State of Illinois as a plaintiff and Chapman, the Utah Defendants, and Direct Marketing Systems as defendants. Plaintiffs filed the Second Amended Complaint (the "Complaint") on June 21, 2010.

The Pretrial Order contains the following claims against the remaining parties in this matter:

(1)     Counts II and III by the FTC against the North Carolina defendants for violations of § 5(a) of the FTC Act;

(2)     Count IV by all plaintiffs against the North Carolina defendants for violation of the TSR;

(3)     Count V by all plaintiffs against Chapman for violation of the TSR;

(4)     Counts VII, VIII and X by the State of Kansas against the North Carolina defendants for violation of the Kansas Consumer Protection Act ("KCPA");

(5)     Count IX by the State of Kansas against the North Carolina defendants for violation of the Kansas Credit Card Statute;

---

[2]Doc. 28.

[3]Doc. 78.

(6)     Counts XI and XIV by the State of Minnesota against the North Carolina

        defendants for violation of the Minnesota Uniform Deceptive Trade Practices

        Act;

(7)     Count XII by the State of Minnesota against the North Carolina defendants for

        violation of the Minnesota False Statement in Advertising Act;

(7)     Count XIII by the State of Minnesota against the North Carolina defendants for

        violation of the Minnesota Prevention of Consumer Fraud Act;

(8)     Count XV by the State of North Carolina against the North Carolina defendants

        for violation of the North Carolina Unfair and Deceptive Trade Practices Act; and

(9)     Counts XVII and XVIII by the State of Illinois for violation of the Illinois

        Consumer Fraud and Deceptive Business Practices Act.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[4]

In applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[5]  A fact is "material" if, under the applicable

substantive law, it is "essential to the proper disposition of the claim."[6]  An issue of fact is

"genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

---

[4]Fed. R. Civ. P. 56(a).

[5]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing
*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

the issue either way."[7]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[13]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[14]  The non-moving party

---

[7]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[8]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir 2000) (citing *Adler,* 144 F.3d at 671).

[10]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[11]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[12]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671).

[13]*Adams*, 233 F.3d at 1246.

[14]Fed. R. Civ. P. 56(c)(4).

cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[15] " "Where, as here, the parties file cross-motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[17]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."

## III.   Uncontroverted Facts[18]

---

[15]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[16]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[17]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[18]The Court takes this opportunity to note the laborious process involved in locating the exhibits referenced in plaintiffs' motion for summary judgment.  Indeed, the delay in rendering an opinion on these motions is due in part to the inartful manner in which these exhibits were labeled and filed.  Plaintiffs created a shorthand labeling system for themselves, beginning each exhibit reference with "PX" followed by a number.  These are the sole references to exhibits in the briefs.  The Index of Exhibits, attached to the memorandum in support, identifies the list of exhibits and their shorthand labels.  Unfortunately, none of these shorthand references, nor the actual exhibit titles were utilized when plaintiffs filed their exhibits.  Instead, they filed their exhibits in six separate docket entries with unhelpful titles such as "Exhibit" and "Deposition Excerpt."
    Plaintiffs added further confusion through a number of other faulty filing practices: (1) When the Court endeavored to open each document to determine its contents and create its own index, some of the exhibits were labeled with an entirely different label than the shorthand label used in the brief.  *See, e.g.*, Doc. 311-5 (titled "Lajiness 6"), or were not actually "deposition excerpts," as stated on the filing, but unlabeled deposition exhibits; (2) There are many instances of missing pages that are cited to in the brief, but not included in the filed exhibit; (3) At least one exhibit entirely fails to match its label, *see* Doc. 312-2 (titled "Sworn Statement of Peter Coir," but an affidavit of Natalie Hogan is attached instead); Doc. 311-7 (Deposition of Meggie Chapman labeled Ex. 1, rather than PX 6 or Ex. 6, referenced in the brief and exhibit index); (4) The Court is entirely unable to locate the Sworn Statement of William Boeckman, identified as PX 7;  (5) Plaintiffs' responses to the defendants' summary judgment motions failed to properly include exhibits as attachments to the briefs, separately filed and labeled, and instead filed them in the same document.  These cumulative filing errors made the process of identifying factual matter extremely

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to the nonmoving party.  The Kansas Corporate Defendants sold grant-related goods and services to consumers throughout the United States.  They sold their grant-related goods and services in three stages: front-end sales, which entailed selling a book entitled the "Professional Grant Writer" (the "Grant Guide"); middle-sales, which entailed selling grant-research services; and back-end sales, which entailed selling grant writing and/or coaching services.

***Front-End Sales***

LPG marketed the grant-related goods and services by mailing or causing to be mailed millions of direct marketing pieces to consumers throughout the United States, including but not limited to consumers in Illinois, Kansas, Minnesota and North Carolina, to induce consumers to purchase grant-related goods or services.  LPG's direct marketing mail pieces advertised the availability of government grants.  Many of LPG's direct marketing mail pieces sent to consumers contained the phrase: "You are Guaranteed a $25,000 Grant from the U.S. Government."

The direct marketing mail pieces contained toll-free numbers for consumers to call to obtain a grant.  Consumers who called the toll-free numbers contained in LPG's direct marketing mail pieces were offered the opportunity to purchase the Grant Guide for $69 ($59 for the Grant Guide plus $10 for shipping and handling).  When consumers called the toll-free numbers on the direct marketing mail pieces, consumers heard a recorded message (the "front-end recording") that included, among other statements, the following phrases: "Congratulations, you have just

difficult and time-intensive.  To the extent the Court is unable to locate documents cited to support a factual statement, the factual matter will not be deemed uncontroverted.  *See* Fed. R. Civ. P. 56(c); D. Kan. R. 56.1.  The Court encourages plaintiffs in the future to examine each filing court's administrative procedures that explain the electronic filing process and consult the clerk's office if unsure as to the appropriate filing procedures for voluminous exhibits.

taken your first step to receive $25,000 or more in free government grant money, guaranteed."
" [T]here's another $300 billion that must be given away this year to people just like you . . . ."
"[I]f you are one of the lucky few who know how to find and apply for these grants, you will receive a check for $25,000 or more, and we guarantee it.  Ask yourself, what would you do with a government check for $25,000 . . . ."  "[Y]our Grant Guide gives you everything you need to easily find these grants and apply for a check, written in your name for $25,000 or more . . . ."

Near the end of the front-end recording, the listening consumer was invited to "press 1" for further information, at which time the calling consumer would be transferred to a live telemarketer who was an agent or contractor for Answer Customers.  The Answer Customers telemarketing agent or contractor would use a script to attempt to sell the Grant Guide to the calling consumer.

An undercover recording of a telephone call placed by an FTC investigator to the toll-free number listed on the LPG Mailings shows that telemarketing agents or contractors for the Kansas Defendants made the following representation to some consumers: "we are so confident in our grant guide that we've established our $25,000 guarantee to make this information completely risk-free."  Another undercover recording of a telephone call placed by an FTC Investigator to the toll-free number listed on the LPG Mailings shows that some telemarketing agents or contractors for the Kansas Defendants referred to the Grant Guide as "guaranteed."

Consumers from across the United States, including from Illinois, Kansas, Minnesota, and North Carolina, bought the Grant Guide from LPG.  The Kansas Defendants cannot identify any individual who received grant money as a result of purchasing the Grant Guide.  Three consumers have testified that they did not receive any grant money, let alone a $25,000 government grant, after purchasing the Grant Guide from the Kansas Defendants.

8

*Middle Sales*

One or more of the Kansas Corporate Defendants contracted for the writing of, bought the copyrights of, and published the Grant Guide.  The Grant Guide contained, in the first few pages, just after the testimonials, a statement that "grant writers have been able to produce a 70% success rate in receiving grant funding."  None of the Kansas Corporate Defendants tracked whether the consumers who purchased the Kansas Corporate Defendants' grant-related goods or services actually received grants.  The 70% success rate claimed by the Kansas Defendants does not relate to GWI or any of the other Kansas Defendants.  Instead, the success rate is the personal success rate achieved by Lynne Paeno, the author of the Grant Guide.  Paeno achieved this success rate through her independent work to obtain grant funding for school districts and non-profit organizations, not individual consumers.

The Kansas Corporate Defendants used a list of those consumers who called about and/or purchased the Grant Guide as leads to sell grant-research services and, in turn, used a list of those consumers who purchased grant-research services as leads to sell grant-writing and/or grant-coaching services (the "Kansas Leads").  The telemarketing for the grant-research services began after consumers purchased the Grant Guide, when they received a call either from GWI or a telemarketer hired by the Kansas Defendants.  In exchange for purchasing grant-research services, consumers received a Research Results document.  Research Results often included loans, contests, entitlement programs, and social welfare programs for which the consumer was not eligible or that did not fit the needs identified by the consumer.

There is no evidence that consumers who purchased the Kansas Defendants' grant-research services, whether directly or through the North Carolina and Utah Defendants, received any grant money as a result of purchasing the grant-research services.

9

1.    **GWI**

GWI sold grant-research, grant-writing, and/or grant-coaching services directly to the Kansas Leads throughout the United States, including but not limited to consumers in Illinois, Kansas, Minnesota and North Carolina.  GWI used telemarketing scripts to sell grant-research, -writing, and -coaching services.  Many of GWI's middle-sales scripts contain the statement that the "Grant Writers Institute has achieved a 70% success rate with their past customers totaling more than $80 million in grant funds for their clients."  The Kansas Defendants represented to consumers that they were likely to receive grant money if they purchased the grant-research services.

The Kansas Defendants' telemarketing sales scripts also began by indicating that the consumers likely have no experience obtaining a grant, that the Defendants were the experts in this area, and that the consumer had a high chance of getting grant funding with the Defendants' help.

One or more of the Kansas Corporate Defendants engaged outside marketers to sell grant-research services on GWI's behalf to Kansas Leads.  One or more of the Kansas Corporate Defendants provided telemarketing scripts to outside marketers who had been engaged to sell grant-research services on GWI's behalf to the Kansas Leads.

2.    **REBFN**

REBFN was one of the outside telemarketers engaged by GWI to sell grant-research services from December 2007 to May 2009.  REBFN at times did business as Grant Writers Research Network.   REBFN is organized under the laws of the State of North Carolina and telemarketed grant services on behalf of GWI from its telephone call center located in Raleigh, North Carolina.   Martin Nossov is the President and a member of REBFN; he controlled or had

the ability to control REBFN.  Alicia Nossov is the organizer, managing member,[19] and registered agent of REBFN.  She was the sole managing member from 2005-2007.

REBFN placed outbound telemarketing calls to consumer leads received from the Kansas Defendants in order to sell GWI's grant-related services.  REBFN held itself out as, or calling on behalf of, GWI in telemarketing calls to consumers.  When REBFN began its grant-research marketing program, neither it nor Martin Nossov knew how its lead broker, NMR, procured the leads that it provided to REBFN.  Martin Nossov also did not know how GWI obtained its leads. At the end of February 2008, Martin Nossov learned that some of the leads that had been provided to REBFN may have been procured by GWI mailing consumers an LPG post card. Martin Nossov immediately contacted both NMR and GWI, who assured him that their firms were not sending out the postcards containing the $25,000 guarantee and that they were working with the Kansas Attorney General to ensure that their marketing efforts complied with applicable laws.  As a matter of company policy, REBFN never instructed its telemarketers to tell consumers that they were guaranteed a $25,000 grant.[20]

One of the Kansas Corporate Defendants, on behalf of GWI, provided at least one telemarketing script to REBFN for its use in selling grant-research services.  From February 27, 2008 until August 2, 2008, REBFN used one of the scripts that included the statements that GWI had a 70% success rate in obtaining grants for its past customers and that it had obtained more

---

[19]While the Court credits Alicia Nossov's declaration that she was never a "manager" of REBFN, it is insufficient to controvert the Secretary of State's record that she was a "managing member" of this limited liability company.  *See* Doc. 350, PX 56, Ex. 2.

[20]Plaintiffs' objection to Martin Nossov's declaration on this point is overruled and denied.  As the President of REBFN, he certainly has personal knowledge of this fact.  *See* Fed. R. Civ. P. 56(c).  The fact that his statement is favorable to him does not render it self-serving and, therefore, inadmissible.  Given his control and authority at REBFN, he has demonstrated personal knowledge of this fact.  Plaintiffs' argument goes to the weight and not the admissibility of his testimony.

than $80 million in funding for its past customers.  Martin Nossov had the ultimate approval

authority over telemarketing sales scripts used by REBFN and on REBFN policy.  He made the

decision to use the script that included the claims that GWI had a 70% success rate and funded

$80 million in the last five years.  Martin Nossov contends that this was included in the script

because REBFN wanted consumers to be aware of the steps available to them in the event they

purchased grant writing.  Indeed, REBFN received 2% on every backend sale of grant writing

services sold to consumers who purchased grant-research services from REBFN.  While Martin

Nossov asked the Kansas Defendants for substantiation of their success, he did not specifically

ask for substantiation of the 70% rate provided in the sales script.

REBFN sold grant-research services to consumers throughout the United States,

including but not limited to consumers in Illinois, Kansas, and Minnesota.  REBFN sold

grant-research services to Kansas consumers 60 years of age and older.  REBFN sold

grant-research services to Minnesota consumers 62 years of age and older.  REBFN first charged

consumers $800 for the grant-research services. The price was later raised to $995, and then

raised again to $1100.

One of the telemarketing sales scripts used by REBFN to sell grant-related goods and

services contains the following scripted lines:

> "Hi this is _____ from the Grant Writing Institute and the
> reason why I'm giving you a call today is because you ordered
> information to obtain a Grant. . . .  We have a team of experts who
> will help you with the research, help you with writing the proposal
> or even write the proposal for you."
>
>     . . . .
>
> "The first stage is to do the research to find out which grants you
> are eligible for."

One of the telemarketing scripts used by REBFN to sell grant-related goods and services

contains the following scripted lines:

> The reason we are following up with you is to see if you would
> like the Grant Writers Institutes team to help you by researching
> and identify [sic] the grants that you might be eligible for from the
> thousands of federal, state, municipal and private grants already
> provided to you by them.  There [sic] team of professionals can
> provide you with a list averaging 5-10 grants that you are eligible
> for with all contact information and applications after researching
> all grants in the category you select.[21]

REBFN telemarketers represented to consumers that they were guaranteed or likely to

receive grant money if they purchased the grant-research services, at times representing that

consumers had upwards of a 90% chance of obtaining grant monies.  These statements were not

explicitly part of the sales scripts used by REBFN, but Martin Nossov knew that some of

REBFN's telemarketers made misrepresentations such as this to consumers.  Martin Nossov

testified during his deposition that he disciplined these telemarketers and that he had a zero-

tolerance policy for such misrepresentations.  He also testified, however, that it was situational

whether REBFN would terminate telemarketers for misrepresentations.

REBFN completed a Research Request Form for each consumer who purchased

grant-research services, based on information provided by the consumer.  In completing the

Research Request Form, REBFN collected information from each consumer, including but not

limited to the consumer's address, age, income and whether the consumer is disabled.  REBFN

sold grant-research services to consumers seeking grant money for a variety of reasons,

including, but not limited to, home improvement and debt repayment.

REBFN began selling grant-research services for the Kansas Defendants without

---

[21]Doc. 314-4 at 9 (Ex. F to Decl. of Julie Daniel at PX 26, p. 43).

reviewing the Kansas Defendants' marketing materials or business model.  Consumer files

maintained by REBFN show that REBFN received copies of the LPG Mailings, touting a

guaranteed government grant of $25,000, from complaining consumers who purchased grant-

research services from REBFN.  REBFN continued selling grant-research services for the

Kansas Defendants even after receiving the LPG Mailings from complaining consumers.  Martin

Nossov reviewed at least one of the LPG Mailings that REBFN received from complaining

consumers. He complained to the Kansas Defendants about the representation in the LPG

Mailing that guaranteed a $25,000 government grant.  Thereafter, REBFN continued to sell

grant-research services on behalf of the Kansas Defendants without proof that the Kansas

Defendants ceased using LPG Mailings that touted $25,000 guaranteed government grants and

without further reviewing the Kansas Defendants' marketing materials.

REBFN had notice of State Attorney General inquiries regarding the Kansas Defendants'

grant-related goods and services.  Martin Nossov also was aware of State Attorney General

inquiries into the sale of the grant-research services.  REBFN ceased selling grant-research

services to consumers in States from which REBFN received investigative demand letters from

the State Attorney General.  In particular, REBFN ceased selling grant-research services to

consumers in the States of North Carolina, Minnesota, Kansas, and Missouri.

REBFN charged consumers for the grant services it sold on behalf of GWI.  On multiple

occasions, REBFN charged consumers' credit cards for the purchase of grant-research services.

REBFN asked each consumer who purchased grant-research services to sign and return a form

setting forth the terms of the consumer's purchase ("REBFN's Terms and Conditions").

REBFN's Terms and Conditions did not contain the statement: "You are not obligated to pay any

money unless you sign this confirmation and return it to the seller."  Martin and Alicia Nossov

obtained the merchant accounts held by REBFN with a merchant based in California.  Some of the accounts were in both of their names, some were in Martin Nossov's name only and some were in Alicia Nossov's name only.  Alicia Nossov was listed on some of the chargeback notifications from the merchants, meaning transactions that were returned by consumers.  These chargebacks were addressed to her at the corporate address, but she did not actually receive or review those chargebacks.  Iris Preissing handled REBFN's chargebacks.

REBFN's gross sales for the grant services it sold on behalf of GWI was approximately $6.5 million.  REBFN refunded approximately $1 million of the $6.5 million it received in gross sales for the grant services it sold on behalf of GWI.  Martin Nossov received more than a million dollars in remuneration from Economic Industry Reports Inc. during the period that REBFN sold grant services on behalf of GWI.  Alicia Nossov received K-1 distributions from REBFN.

REBFN received and responded to consumer complaints about the grant-research services.  Every consumer complaint about the grant-research services was brought to Martin Nossov's attention.  Martin Nossov knew that opportunities for loans and contests were included in the Research Results fulfilled by Meggie Chapman.  Martin Nossov knew that REBFN received complaints from consumers about the inclusion of loans and contests in the research results.  Martin Nossov knew that consumers complained that REBFN sales agents told them that grant writing was included in the purchase price for the grant-research services.  The North Carolina Defendants claimed that they could identify one individual who received a grant after paying for their services, but this individual, Pank Edwards, did not receive a grant.

Martin Nossov knew in December 2008 that he did not want to continue to do business with the Kansas Defendants because he believed the owner or manager of GWI, Brett Blackman,

was deceitful.  He continued, however, to do business with the Kansas Defendants until May 2009.

Alicia Nossov has never made policy decisions for REBFN, nor has she ever controlled the company's day-to-day operations.  She has never supervised REBFN's telemarketers, nor has she negotiated contracts on behalf of the company.[22]  During the time period that REBFN sold grant-related products, Alicia Nossov was not aware of how REBFN obtained customers, what REBFN's telemarketers told customers, nor whether any customers were or were not satisfied with their purchases.

### Back-End Sales

Consumers who purchased grant-research services were further solicited through telemarketing by the Kansas Defendants for the purchase of grant writing and coaching services. They offered grant writing services for at least $225 per page and grant coaching services for as much as $1495.  The Kansas Defendants used telemarketing sales scripts to sell the grant writing and grant coaching services.  One such script states that consumers are likely to receive a grant if they purchase grant writing services.  The Kansas Defendants represented to consumers that they were guaranteed or likely to receive grant money if they purchased the grant writing and coaching services.

Numerous consumers did not receive any grant money as a result of purchasing the

---

[22]The Court declines to disregard Alicia Nossov's declaration on these matters.  Fed. R. Civ. P. 56(c)(4) requires that affidavits be made on personal knowledge and "set out facts that would be admissible in evidence . . . ." Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.  "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"  *Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006). Statements of "mere belief in an affidavit must be disregarded."  *Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).  The fact that evidence is favorable to defendant does render it inadmissible as biased or self-serving. Here, Alicia Nossov certainly has personal knowledge as to her own role at REBFN and the Court considers this evidence without weighing her credibility as a witness.

Kansas Defendants' grant-related goods and services.  The total gross revenues reported by LPG and GWI from 2007-2009 exceed $27 million.

***Fulfillment of Grant-related Goods and Services***

In order to fulfill the grant-related goods and services sold to consumers, the Kansas Corporate Defendants contracted with grant-researchers and grant writers, including but not limited to Meggie Chapman and Lynne Paeno.  One or more of the Kansas Corporate Defendants contracted with  Paeno in early September 2007 to write the Grant Guide, which was sold during the front-end stage of the sales process.  Lynne Paeno subcontracted with Chapman to write portions of the Grant Guide.  The Kansas Defendants contracted for the writing of, bought the copyrights to, and published the Grant Guide.  Paeno has since attempted to distance herself from GWI and has requested on numerous occasions that they remove her name from the Grant Guide.  As of June 15, 2009, LPG and ASI representatives had either declined or not responded to her requests.

One or more of the Kansas Corporate Defendants engaged Paeno, who subcontracted with Chapman, to provide the grant-research, grant-writing, and/or grant coaching/mentoring services marketed by GWI, REBFN, the Utah Corporate Defendants, and by other marketers the Kansas Corporate Defendants contracted with to sell grant-related goods and services to the Kansas Leads.  Prior to performing grant-research services for the Kansas Defendants, Chapman had not performed any grant-research for individual consumers.  Her business had focused only on grant-research and writing for schools and non-profits.

In June 2008, Paeno ceased providing grant-related fulfillment services to the Kansas Corporate Defendants; however, she continued to collect revenues until July 2009, and requested royalties from the Kansas Defendants for the sale of the Grant Guide.  After Paeno ceased

17

providing grant-related fulfillment services, in approximately August 2008, the Kansas Corporate Defendants directly engaged Chapman to fulfill the grant-research, grant writing, and grant coaching and mentoring services sold by GWI, REBFN, and the Utah Corporate Defendants, and by other marketers the Kansas Corporate Defendants contracted with to sell grant-related goods and services to the Kansas Leads.  Chapman did business as Meggie Chapman and Associates and controlled or had the ability to control Meggie Chapman and Associates.  Chapman did no telemarketing, but Chapman knew that one or more of the Kansas Corporate Defendants engaged in telemarketing.  Chapman did not solicit customers on behalf of the other defendants.

Chapman drafted a questionnaire that the Kansas Defendants and telemarketers used in some form to collect information from consumers who purchased grant-research services. Chapman would provide the completed lists of potential money sources (the "Research Results") to the Kansas Defendants, who would then provide those results to the purchasing consumers. She would fulfill the grant writing services by utilizing independent contractors who drafted or completed proposals and/or applications on behalf of consumers to the potential money sources that were identified in the Research Results.  She also employed grant-researchers to help her prepare grant proposals and grant writers to help her prepare the grant proposals for consumers who purchased the grant writing services.  Chapman fulfilled the grant coaching services by creating a grant coaching workshop.  Chapman provided limited training for the NMR sales floor on information needed to process research requests.  Chapman did not enter into a contract with the Kansas Defendants for the grant-research service she provided; she exchanged drafts of a contract for the writing services but it was never executed; she did enter into a contract with the Kansas Defendants for the coaching workshop.

When Chapman first started receiving research requests from the Kansas Defendants, she would review them and, if additional information was needed in order to conduct the research or if she felt the request was inappropriate, the request was sent back to the Kansas Defendants. Chapman identified a prior grant writing company utilized by the Kansas Defendants as the source of some of the consumer complaints as they related to the sale of opportunities, despite an individual's ineligible status or the non-existence of a viable opportunity. Chapman performed additional research and provided replacement opportunities, in order to resolve complaints. Chapman would also bring to the attention of the Kansas Defendants issues they were not aware of in attempting to improve the products and services offered.

After Chapman had been working with ASI for a period of time, Jordan Sevy asked Chapman to put together an estimate or a quote of what her company would charge for international customers. ASI also asked Chapman about preparing newsletters for their website and possibly providing some web content, so Chapman prepared a proposal for these services in February 2009. Chapman came up with an idea for the Kansas Defendants to sponsor a quarterly grant contest in order to generate consumer leads for their grant-related goods and services and for other business models engaged in by the Kansas Defendants. Chapman also sent the Kansas Defendants an email with "talking points for possible discussion and explanation," explaining that she had been "brainstorming ways that we can expand as well as repackage what we are currently doing to appeal to all parties."[23]

Chapman prepared a "blurb" for the Kansas Defendants to place on the LPG website. She also drafted a description on how contests are similar to grants, with the understanding that

---

[23]Ex. 30 to Dep. of Chapman, Doc. 311-7 at 187.

the Kansas Defendants would include that written description with the Research Results that she completed for consumers who purchased the Kansas Defendants' grant-related goods and services.  Chapman further came up with the idea to include contests in the Research Results.  At the request of the Kansas Defendants, Chapman provided them with a bullet point list of the benefits to using a grant writer.  Chapman researched payment processing companies on behalf of the Kansas Defendants.

Chapman and/or Meggie Chapman and Associates received compensation from one or more of the Kansas Corporate Defendants to provide grant-research and/or grant-writing and/or grant-coaching services to consumers.  Chapman received $75 for each grant coaching workshop that was sold.  She received $300 for the first five pages of grant writing and $35 per page for each additional page.  Chapman received between $125 and $140 for each grant-research order she fulfilled on behalf of the Kansas Defendants.  Beginning in approximately August 2008, Chapman began receiving $160 for each grant-research order she fulfilled on behalf of the Kansas Defendants.  She and her contractors conducted approximately 8000 researches on behalf of the Kansas Defendants.  According to Chapman's invoices to the Kansas Defendants, she received $1,682,950.00 from the Kansas Defendants in exchange for providing fulfillment services to consumers who purchased grant-related services from the Kansas Defendants or the North Carolina or Utah Defendants.

Chapman knew that one or more of the Kansas Corporate Defendants engaged in telemarketing.  At some point in time, she learned  that they charged consumers $995 for the grant-research services she provided to them.  Chapman knew sometime at the beginning of her business relationship with the Kansas Defendants that certain State Attorneys General were making inquiries into their grant-related operations.  Chapman assisted one or more of the

Kansas Corporate Defendants in responding to inquiries from the Alaska Attorney General's office and from the North Carolina Attorney General's office.

Chapman did not review the marketing materials that the Kansas Corporate Defendants used to induce consumers to purchase grant-research, -writing, or -coaching services from Chapman and Associates.  Chapman did not review the front-end telemarketing recordings or the telemarketing scripts that the Kansas Corporate Defendants used to induce consumers to purchase grant-research, -writing, or -coaching services.[24]  Chapman did not review the telemarketing recordings or the telemarketing scripts that WPS used to induce consumers to purchase grant-research, -writing, or -coaching services.

Chapman cannot identify any consumer who received grant money as a result of purchasing the grant services; however, Chapman did not track whether any of the consumers who purchased her grant-related fulfillment services actually received a grant, although she had the contact information for those consumers for whom she provided services.  She asked the Kansas Defendants whether consumers received the grants after purchasing grant-related services and was told that "people would call in and say what great quality of work the writing was, but nobody necessarily had called in to say they got anything."  Chapman admits she worked with Chris Roehl to gather customer comments for GWI to use on the Internet.  Neither Chapman nor her researchers spoke to consumers for whom they performed grant-research and writing services on behalf of the Kansas Defendants.

Chapman admits knowing that GWI and/or ASI had some issues with salespeople making some sort of representation to consumers that they were likely to receive grant monies if they

---

[24]Chapman testified that she may have received a script from Paeno early on in the business relationship, but she sent it back to her.

21

purchased grant-research services, but she was told the situation had been addressed or corrected. Chapman was told at a dinner hosted in October 2008 by Blackman's wife that ASI/GWI had made changes to their marketing as a result of some request from the Kansas Attorney General.

Some of the funders included on the Research Results were institutions that did not fund individual consumers, or that did not provide monetary funding, or that did not exist, or that requested that their names be removed from lists given by the defendants to consumers. Some of the funders either did not offer monetary funding, or the consumer did not meet the funder's qualifications to receive funding. Chapman was aware that the Research Results included assistance programs, contests, and loans in addition to grants. If Chapman discovered that her company had included research that she later learned individual consumers did not qualify for, her company researched and issued replacement results. Chapman took several steps to ensure the viability of the grant opportunities she offered by reviewing U. S. Department of Treasury, Internal Revenue Service Form 990, "Return of Organization Exempt From Income Tax," that describes the funding available from the entity filing the form. Chapman took the further step of independently verifying the type of funding offered by contacting charities directly to discuss their available grant opportunities. To the extent an organization's funding priorities could not be verified, Chapman stopped using the organization as an available opportunity and made research replacements for that opportunity.

Chapman knew that only 2% of grants are available to individual consumers and that grants for school districts and non-profits are more viable than grants for individual consumers. She understood that this 2% represented "billions of dollars" in grant money. Chapman admits that grants cannot be guaranteed.

22

Chapman provided grant services on behalf of one or more of the Kansas Corporate Defendants and on behalf of WPS to consumers throughout the United States.  At the time the Original Complaint was filed, approximately 80-90% of Meggie Chapman's business related to grant fulfillment services provided on behalf of the Kansas Defendants.

***Activities of the Utah Defendants and Chapman after Filing of Original Complaint***

WPS and Aria are both limited liability companies organized under the laws of the State of Utah.  The owners of WPS and Aria are Brian McAdam and Deric Gurley.  Justin Ely was the President of Aria from February to May 2009 and acted as an agent for WPS in its business relationship with the Kansas Defendants.  Ely also controlled or had the ability to control Direct Marketing Systems.  Ely had a business relationship with the Kansas Defendants.  After the TRO was entered against the Kansas Defendants in this case, Ely continued to provide Kansas Leads to the Utah Corporate Defendants.

In approximately July 2009, Chapman learned that the Original Complaint in this matter had been filed against the Kansas Defendants and the North Carolina Defendants.  She also learned that the TRO had been entered against the Kansas Defendants.  Chapman did not implement any changes to her business practices, as she understood the Complaint in this case only related to the marketing of defendants' grant-related services.

Chapman began working with Ely in August 2009, but did not do any research about Ely or his background prior to this time.  After the TRO was entered, Ely paid Chapman for grant-related services that she had performed for GWI, but for which she had not been paid.[25] Ely introduced Chapman to Gurley and McAdam and asked Chapman to continue providing

---

[25]This is a stipulated fact; therefore, Chapman's attempt to controvert it on summary judgment is unavailing.  Generally, parties are bound by the Pretrial Order and the facts stipulated therein.  *See, e.g.*, *Glover v. NMC Homecare, Inc.*, 13 F. App'x 896, 902–03 (10th Cir. 2001).

grant fulfillment services on behalf of WPS, Innovative Research Group ("IRG"), and Life Change Solutions ("LCS"), and she agreed. Chapman understood that this work was for individual consumers. When Chapman began providing grant fulfillment services on behalf of WPS, IRG, and LCS, she went to each company's website. Other than going to the websites, Meggie Chapman did not research WPS, IRG, and LCS.

Ely paid Chapman $160 for each grant-research she fulfilled. In addition, Justin Ely reimbursed her for the shipping costs because she was to send the research results directly to consumers. For grant writing, Justin Ely paid Meggie Chapman $300 for the first five pages and then $35 per page for each additional page.

Beginning in August 2009, Chapman began working with WPS, IRG, and LCS directly, and ceased working with Ely. Around that time, she learned that Ely had previously been sued by the FTC. WPS began to pay Chapman directly for fulfillment services she provided to consumers who purchased grant-research services from WPS. Chapman continued to provide grant-research and/or grant-writing and/or grant-coaching services to consumers who purchased such services from WPS. Chapman and/or Meggie Chapman and Associates received compensation from WPS to provide grant-research and/or grant writing and/or grant-coaching services to consumers. Chapman provided grant services on behalf of WPS to consumers throughout the United States.

After WPS was added as a defendant to his action, Chapman began providing grant-related fulfillment services to consumers who purchased such services from EMS, another Utah entity affiliated with Gurley and McAdam. Chapman currently provides services to EMS. EMS pays Chapman approximately $30,000 per month for these fulfillment services. Chapman has not reviewed the marketing materials or telemarketing sales recordings or sales scripts that EMS

24

uses to induce customers to purchase grant services.  Up until September 2010, Chapman did not track whether consumers who purchase her grant-related services from EMS actually receive a grant.  Consumers have complained that EMS (under the d/b/a My Funding Resources) has misrepresented the grant-research services during telemarketing calls.

## IV.   Discussion

### A.   Claims Under § 5(a) of the FTC Act: Counts II and III

Section 5(a)(1) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."[26]  To establish an unfair or deceptive act or practice, the FTC must show "that the representations omissions, or practices likely would mislead consumers, acting reasonably, to their detriment."[27]  The Tenth Circuit has explained:

> The primary purpose of § 5 is to lessen the harsh effects of *caveat emptor.*  Such rule can no longer be relied upon as a means of rewarding fraud and deception and has been replaced by a rule which gives to the consumer the right to rely upon representations of facts as the truth.  Because the primary purpose of § 5 is to protect the consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation.  Instead, the "cardinal factor" in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork will have on the mind of the ordinary consumer.[28]

In determining whether a claim is deceptive, the Court is not limited to express claims, but may also look to the overall net impression of the promotional statements by the defendant.[29]

---

[26]15 U.S.C. § 45(a)(1).

[27]*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988).

[28]*FTC v. Freecom Comm'cns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005) (quotation and citations omitted).

[29]*Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008).

In Count II, the FTC alleges that the North Carolina Defendants falsely represented that GWI had a 70% success rate in obtaining grant funding for consumers who purchase defendants' services.  In Count III, the FTC alleges that the North Carolina Defendants falsely represented that consumers who purchase the Kansas Defendants' goods and services are likely to receive grant monies.

The uncontroverted evidence shows that REBFN did make the statement to its consumers that defendants had achieved a 70% success rate in obtaining grant funding for consumers and that they had obtained more than $80 million in grant money for consumers.  This statement was included in the sales script that REBFN admits to using, at least for a five-month period of time.  "Express representations that are shown to be false are presumed material."[30]  It is uncontroverted that the 70%/$80 million success rate claim is false, at least as it pertains to defendants.  The claim was made by Paeno in the Grant Guide, based on her work preparing grants for educational institutions and non-profit organizations.  There is no evidence in the record that these statistics could be imputed to defendants' services that are entirely directed to individual consumers.  The fact that none of the defendants tracked the success of their services is further uncontroverted evidence that this representation was false.  REBFN argues that it only used the script with this representation for a few months out of the eighteen-month long business relationship with the Kansas Defendants.  But there is no durational requirement under the FTC Act, and REBFN fails to explain how this fact is otherwise material.

Despite the presumptive materiality of this express claim, REBFN further claims that there is a genuine issue of material fact about whether the 70% success rate representation was

---

[30]*Med. Billers Network, Inc.*, 543 F. Supp. 2d at 304.

material to consumers' decisions to purchase the grant-research services.  REBFN points to

Martin Nossov's declaration, where he provides sales figures for the period before and after

REBFN used the 70% success rate sales script.  According to these numbers, the North Carolina

Defendants argue that REBFN's sales did not decline after the 70% success rate representation

was removed from the sale script.  Plaintiffs urge that this evidence is inadmissible, as there are

no sales figures attached to Martin Nossov's declaration to support these numbers.  Assuming

the admissibility of these sales figures, they are insufficient to overcome the presumption that the

70% success rate representation is material.  Martin Nossov provides the sales figures in terms of

units of research only for the following months in 2008: February (309), March (310), July

(525), and August 2008 (520).  He claims in his deposition that REBFN used the 70% success

rate sales script from February 27, 2008 until August 2, 2008.  He does not provide sales figures

for three out of the five months that REBFN utilized this sales script.  Given the limited sales

figures provided, the Court cannot find that this evidence creates a genuine issue of material fact

on the materiality of the representations.  Viewing the evidence in the light most favorable to

defendants, it shows that the sales figures increased substantially during the exact period of time

that they used the 70% success rate sales figures.  While the numbers decreased by only five

units during the month of August, this evidence is not significant enough to overcome the

presumption that REBFN's expressly false statement was material to consumers' decision to

purchase grant-research services.

It is also uncontroverted that REBFN telemarketers represented to consumers that they

were guaranteed or likely to receive grant money if they purchased the grant-research services, at

times representing that consumers had upwards of a 90% chance of obtaining grant monies.

Even though these statements were not explicitly part of the sales scripts used by REBFN, it is

uncontroverted that certain telemarketers made misrepresentations such as this to consumers in order to boost sales.

The FTC submitted the declarations of four individuals, Michael Grace, Lucy Gomez, Susan Monroe, and Pank Edwards, who were contacted by REBFN, which guaranteed or stated it was highly likely they would receive grant money. Yet, REBFN is unable to identify any of its customers that actually received a grant as a result of purchasing its grant-research services, and it is uncontroverted that it did not track consumer success after it completed a sale. In fact, REBFN identified Edwards as a recipient of grant money; however, his declaration establishes that he received no grant, despite paying more than $1800 for grant-research and writing services.

REBFN argues that its sales scripts do not include guarantees of success, pointing to the words "may" and "might." They also argue that the telemarketers were not instructed to make such guarantees. However, it is uncontroverted that some of the telemarketers deviated from the scripts, so the extent of the representations cannot be measured only by the content of the sales scripts. And, as the FTC points out, the fact that such qualifying words were used by the REBFN telemarketers does not negate the fact that they are deceptive. The standard is whether they would mislead an ordinary consumer, which the Court evaluates based on the net impression the statements create, even if they are made in conjunction with truthful disclosures.[31] "The alleged misrepresentations should be evaluated as a whole without emphasizing isolated words or phrases apart from their context."[32] When evaluating these statements as a whole, the use of the words "may" and "might" do not blunt the overall net impression created by REBFN's

---

[31]*See, e.g.*, *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992).

[32]*Med. Billers Network, Inc.*, 543 F. Supp. 2d at 304.

statements that these customers were either guaranteed, 90% likely, or highly likely to receive a grant if they purchased the grant-research services.

The uncontroverted evidence also shows that these representations were material and were likely to mislead the ordinary consumer. All of the consumers' declarations state that they purchased grant-related services from REBFN based on the telemarketers' assurances that they were guaranteed or highly likely to receive a grant. They each paid thousands of dollars for grant-research and writing services,[33] with the understanding that this money would be offset by the grant money they would receive in return.

Finally, REBFN references its Terms and Conditions that consumers were required to sign and return before they paid for the grant-research. First, the Court acknowledges that the actual terms and conditions provided to consumers by REBFN after its consumers authorized the services, is controverted. REBFN points to terms that include the language "this service offer is not a guarantee of receiving a grant." But the FTC points to evidence that shows multiple formats containing various disclaimers. And the disclaimers include statements such as, "in the rare event that you don't meet the criteria for any grant matches, . . . GWRN will refund . . . ."[34] Again, the Court evaluates whether representations are likely to mislead the ordinary consumer and evaluates the net impression conveyed by defendants' representations. The uncontroverted evidence establishes that the net impression on the consumer after the transaction with REBFN is that they were paying for services that would guarantee or would likely result in the receipt of grant money. Even the disclaimer language relied upon by REBFN in its terms and conditions is

---

[33]It is also uncontroverted that REBFN touted the 70% success rate claim in order to show consumers their success if they purchased grant writing; it received 2% on every backend sale of grant writing services for those consumers who purchase grant-research from REBFN.

[34]PX 55, Exs. 2, 3, 5, 6, 22, 23, 28 (Doc. 350).

qualified by the further misrepresentation that it is rare that a consumer does not meet grant criteria.  In fact, REBFN did not track whether any of its consumers actually qualified for grants produced by the grant-research.  REBFN's disclaimers may not be evaluated outside of their context.  When read in context, they fail to reverse the net impression that REBFN guaranteed, or represented it was highly likely, that consumers would receive grant money in exchange for REBFN's services.[35]

Given this uncontroverted evidence, no reasonable factfinder could determine that there is a genuine issue of material fact about whether REBFN made the statements to consumers alleged in Counts II and III, nor could a reasonable factfinder determine there is a genuine issue of material fact about whether these statements were material and likely to mislead an ordinary consumer.  Accordingly, summary judgment is appropriate on the FTC's claims in Counts II and III against REBFN under § 5 of the FTC Act.

### B.   State Law Claims for Deceptive Acts and Practices

### 1.   Kansas: Counts VII, VIII, IX, X

### a.   KCPA

The State of Kansas brings Count VII against the North Carolina Defendants for making the representations set forth in Counts II and III in violation of the KCPA, specifically K.S.A. § 50-626(b)(1)(G).  Section 50-626(a) prohibits "suppliers"[36] from engaging in "any deceptive act or practice in connection with a consumer transaction," and subsection (b) provides:

> Deceptive acts and practices include . . . the following, each of

---

[35] See FTC v. Data Med. Capital, Inc., No. SA CV 99-1266 AHS, 2010 WL 1049977, at *28 (C.D. Cal. Jan. 15, 2010); FTC v. Vocational Guides, Inc., No. 3:01-0170, 2009 WL 943486, at *16 (M.D. Tenn. Apr. 6, 2009); FTC v. Peoples Credit First, LLC, No. 8:03-CV-2353-T, 2005 WL 348588, at *6 (M.D. Fla. Dec. 18, 2005).

[36] K.S.A. § 50-624(j).

which is declared to be a violation of this act, whether or not any
consumer has in fact been misled:
(1) Representations made knowingly or with reason to know that: .
. . (G) use benefit, or characteristics of property or services has
been proven or otherwise substantiated unless the supplier relied
upon and possesses the type and amount of proof of substantiation
represented to exist.[37]

The uncontroverted evidence shows that REBFN meets the definition of "supplier," as it

constitute a seller, who in the ordinary course of business, engages in the practice of

telemarketing grant-related goods and services.  The KCPA prohibits "any deceptive act or

practice in connection with a consumer transaction."[38]  It is uncontroverted that REBFN's sales

practices were made in connection with consumer transactions in Kansas, as defined by K.S.A. §

50-626(a).  Because REBFN is a supplier and engaged in practices in connection with consumer

transactions in Kansas, it is subject to the KCPA.

As already discussed in relation to the FTC Act claim, the uncontroverted facts show

that REBFN made the representations alleged in Counts II and III.  The Court further found that

these representations were material and were likely to mislead an ordinary consumer.  For all of

the reasons previously discussed, there is no genuine issue of material fact that these

representations were made and that they constitute a deceptive act or practice under the KCPA.

REBFN contends that the 70% representation related to grant writing and not grant-

research services, therefore, the representation did not relate to a product sold by REBFN.  But

there is no indication in the text of the statute that this fact precludes liability.  In interpreting the

KCPA, "the guiding principle to be applied . . . is that the act is to be liberally construed in favor

---

[37]K.S.A. § 50-626(b)(1)(G).

[38]K.S.A. § 50-626(a).

of the consumer."[39]  Even assuming that the 70% representation pertained to grant writing only, REBFN made this representation in order to induce customers to buy the grant-research services offered by it.  And the consumers' testimony all indicate that the representations about guaranteed or likelihood of success was a material factor in their decision to purchase the grant-research services.  Moreover, many of these consumers understood that they were purchasing both research and writing services.  The uncontroverted facts show that the representations were unsubstantiated.

Further, there is no genuine issue of material fact that REBFN's representations were made knowingly or with reason to know that the use benefit, or characteristics of property or services, has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof of substantiation represented to exist.  Under K.S.A. § 50-626(b)(1)(G), defendants must possess the type of proof and substantiation that they represented exist.  REBFN claims that it was aware that the 70% claim was made in the Grant Guide.  But Martin Nossov testified that he did not see the Grant Guide until after he authorized the script with the 70% claim.  And, as the Court has previously explained, the representations made by these defendants were unsubstantiated.  While Martin Nossov asked the Kansas Defendants for substantiation of their success, he did not specifically ask for substantiation of the 70% rate provided in the sales script that he determined should be read by the REBFN telemarketers.  And REBFN admits that it did not receive any data to substantiate the success claims.  Furthermore, the recorded meetings between Martin Nossov and the REBFN telemarketers, disciplining them for making guarantees in their sales calls, is uncontroverted

---

[39]*Kansas ex rel. Stephan v. Bhd. Bank & Trust Co.*, 649 P.2d 419, 422 (Kan. Ct. App. 1982).

evidence that REBFN knew that those guarantees about the likelihood of obtaining grant money, were unsubstantiated.

The State of Kansas also seeks to hold Martin Nossov and Alicia Nossov liable under the KCPA.  Under Kansas law, individual officers can be held liable under the KCPA:

> An officer of a corporation is personally liable for wrongful actions of that corporation if he approved or sanctioned the action. He is liable if he is personally guilty of making false representation as to material matters in connection with the corporation's action. He is personally liable if he willfully participated in acts of fraud and deceit. This liability does not depend upon piercing the corporate veil or upon the application of any alter ego theory.[40]

Here, there is ample uncontroverted evidence that establishes Martin Nossov approved or sanctioned the wrongful actions of REBFN.  In fact, it is an uncontroverted fact that Martin Nossov controlled or had the ability to control REBFN.  Moreover, it is uncontroverted that Martin Nossov approved of the telemarketing scripts, failed to substantiate the representations made in the scripts he approved that were provided by the Kansas Defendants, and was aware that REBFN telemarketers were making claims during sales of guaranteed or 90% likelihood of receiving grants.  No reasonable factfinder could determine that there is a genuine issue of material fact about whether he approved or sanctioned REBFN's representations, as alleged in Counts II and III.  Therefore, summary judgment is appropriate on this claim against Martin Nossov.

While it is uncontroverted that Martin Nossov approved or sanctioned the actions of REBFN, there is a genuine issue of material fact about the extent of Alicia Nossov's authority and control at REBFN.  The uncontroverted facts are that she was the organizer, managing

---

[40]*Kansas ex rel. Stephan v. Commemorative Servs. Corp.*, 823 P.2d 831, 840 (Kan Ct. App. 1991).

member, and registered agent of REBFN, an LLC.  She was the sole managing member from 2005-2007.  However, it is controverted that she exercised any control over the day-to-day operations at REBFN.  Alicia Nossov was listed on some of the chargeback notifications from the merchants, meaning transactions that were returned by consumers.  These chargebacks were addressed to her at the corporate address, but she did not actually receive or review those chargebacks.  Alicia Nossov received K-1 distributions.  But Alicia Nossov contends in her declaration that she has never made policy decisions for REBFN, and never controlled the company's day-to-day operations.  She has never supervised REBFN's telemarketers, nor has she negotiated contracts on behalf of the company.  During the time period when REBFN sold grant-related products, Alicia Nossov was not aware of how REBFN obtained customers, what REBFN's telemarketers told customers, nor whether any customers were or were not satisfied with their purchases.  Given these controverted facts, the Court is unable to conclude that the State of Kansas is entitled to judgment as a matter of law against this defendant.  Accordingly, plaintiffs' motion for summary judgment on Counts VII and X is granted as to defendants Martin Nossov and REBFN.[41]  Plaintiffs' motion is denied on Count VII as to defendant Alicia Nossov.

**b.    Kansas Credit Card Statute**

The State of Kansas brings Counts VIII and  IX against the North Carolina Defendants for a violation of K.S.A. § 50-672(b), which requires telemarketers to send a confirmation disclosing in full the terms of the sale to the consumer and receive the signed confirmation from

---

[41]The State of Kansas also brought Count X against all defendants except Chapman for violating the KCPA while engaging in consumer transactions with elder or disabled Kansas consumers, as defined in K.S.A. § 50-676.  This Count was not addressed in plaintiffs' motion for summary judgment, but only pertains to the penalties applicable to REBFN and Nossov on their KCPA violation alleged in Count VII.  Because it is uncontroverted that REBFN sold grant-research services to Kansas consumers 60 years of age and older, the court may impose an additional penalty under K.S.A. § 50-677.

the consumer before the agreement to purchase any goods or services will be considered valid and binding.[42]  Count VIII alleges a violation for charging consumers' credit cards for purchase of the Grant Guide and Count IX for charging consumers' credit cards for purchase of grant-related services.

There is no evidence in the summary judgment record that the North Carolina Defendants participated in the sale of the Grant Guide, and the Court presumes that the FTC intended to include this count in its list of counts that are moot in light of the Kansas Defendants' default and settlement, as it does not argue this Count in its motion.  But because this Count is alleged against all defendants other than Chapman and because the record is devoid of evidence that the North Carolina Defendants participated in the sale of the Grant Guide, or accepted credit card payments on behalf of the Kansas Defendants for the Grant Guide, plaintiffs' motion for summary judgment is denied on Count VIII against the North Carolina Defendants.

Under K.S.A. § 50-672(a), a verbal agreement made by a consumer to purchase goods or services from a telemarketer is not valid and binding unless the telemarketer receives a signed confirmation from the consumer.  Telemarketers are required to provide the following information in the confirmation:

> (1) The name of the telemarketer;
> (2) the address and telephone number at which personal or voice contact with an employee or agent of the telemarketer can be made during normal business hours;
> (3) a list of all prices or fees being requested, including any handling, shipping, delivery, or other charges;
> (4) the date of the transaction;
> (5) a detailed description of the goods or services being sold;
> (6) a duplicate copy with the complete information as presented in the original confirmation, to be retained by the consumer as proof

---

[42]K.S.A. § 50-672.

of the terms of the agreement to purchase; and
(7) in a type size of a minimum of twelve points, in a space
immediately preceding the space allotted for the consumer
signature, the following statement:
"YOU ARE NOT OBLIGATED TO PAY ANY MONEY
UNLESS YOU SIGN THIS CONFIRMATION AND RETURN IT
TO THE SELLER."

First, REBFN argues that this statute does not apply to it because there is a genuine issue of material fact about whether the transactions are "verbal agreements" that require a follow-up confirmation. REBFN contends that its consumers were not charged unless and until they returned the Terms and Conditions, which constitute written sales contracts. It is uncontroverted that REBFN asked each consumer who purchased grant-research services to sign and return a form setting forth the terms of the consumer's purchase. REBFN's Terms and Conditions did not contain the statement: "You are not obligated to pay any money unless you sign this confirmation and return it to the seller."

Yet, Martin Nossov testified that before the confirmation form with the Terms and Conditions was sent out, the consumer completed an application with the telemarketer over the phone, and provided the telemarketer with the credit card information. After REBFN received the signed form, "we would then have customer service charge the card that had previously been authorized."[43] No reasonable factfinder could conclude that REBFN did not have a verbal agreement with its consumers after its sales calls that was confirmed by the follow-up written document. If these consumers entered into written contracts only, there would be no need for the consumer to provide a credit card number over the phone. Instead, there is no genuine issue of material fact that the documents sent to consumers after the sales calls constituted confirmations

---

[43]DX 1 at 46 (Doc. 337-1).

of a verbal agreement between the parties.

REBFN also argues that it complied with the statute except for the required language in subsection (7).  Because it otherwise substantially complied with the statute, REBFN argues that summary judgment is not warranted.  But the requisite statement is mandated by the statute. Defendants offer the Court no authority for the proposition that substantial compliance excepts them from this explicit and specific requirement.  Accordingly, summary judgment is granted in favor of the State of Kansas on Count IX against the North Carolina Defendants.

### 2.      Minnesota: Counts XI, XII, XIII, XIV

In Count XI, the State of Minnesota alleges the North Carolina Defendants violated the Minnesota Uniform Deceptive Trade Practices Act, § 325D.44, subdivisions 1(2), (3), (5) and (13), which read:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . .
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3) causes likelihood of confusion or misunderstanding as to the affiliation, connection, or association with, or certification by, another; . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . . or (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[44]

In Count XIII, plaintiff alleges a violation of the Minnesota Prevention of Consumer Fraud Act § 325F.69, subdivision 1, which prohibits the following:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in

---

[44]Minn. Stat. § 325D.44, subd. 1(2), (3), (5), (13) (2004).

> connection with the sale of any merchandise, whether or not any
> person has in fact been misled, deceived, or damaged thereby, is
> enjoinable as provided in section 325F.70.[45]

Defendants respond by incorporating their arguments set forth in response to the FTC Act and TSR claims. For substantially the same reasons set forth in plaintiffs' motion for summary judgment, and in the Court's discussion of the FTC Act claims, the Court finds that plaintiffs' summary judgment motion as to REBFN should be granted on Counts XI and XIII.

In Count XII, the State of Minnesota alleges all defendants except Chapman violated Minnesota Statute § 325F.67 by circulating, placing before the public or causing to be placed before the public, with the intent to sell grant-related and other goods and services, certain postcards and other advertisements with false representations. As with Count VIII, there is no indication in the record that the remaining defendants took part in this activity and plaintiffs do not discuss this count separately in their brief. Therefore the Court denies plaintiffs' motion for summary judgment on this claim to the extent it is not moot.

Corporate officers, directors, and shareholders may be held individually liable for violations of the Minnesota consumer fraud statutes.[46] Such individuals have been held liable "where there exists substantial evidence that [they] participated in or acquiesced in" the conduct,[47] and where the individual "was both intimately involved in all aspects of [the] business and responsible for . . . all of [the] promotional claims."[48] For the reasons explained on the

---

[45]Minn. Stat. § 325F.69, subd. 1.

[46]*See Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1086 (D. Minn. 2001); *Minnesota by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 897–98 (Minn. Ct. App. 1992).

[47]*Meyer*, 156 F. Supp. 2d at 1086.

[48]*Humphrey*, 490 N.W.2d at 898.

Kansas claims, the evidence is uncontroverted that Martin Nossov acquiesced in the conduct at issue on these claims and that he was intimately involved with approving the claims made by the REBFN telemarketers.  Accordingly, summary judgment is appropriate against Martin Nossov on the Minnesota claims as well.[49]

For the reasons explained on the Kansas claims, there is a genuine issue of material fact about Alicia Nossov's authority and control over REBFN.  Accordingly, summary judgment is not appropriate against this defendant on the Minnesota claims.

### 3.     North Carolina: Count XV

The State of North Carolina alleges a violation of N.C. Gen. Stat. § 75-1.1, which states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."[50]  At a minimum, to establish a claim under the North Carolina Uniform and Deceptive Trade Practices Act, "a party must establish that (1) the defendant engaged in an 'unfair' or 'deceptive' act or practice; (2) the act was in or affecting commerce; and (3) the act injured the plaintiff."[51]  "Knowledge of the misrepresentation is not essential."[52]  When, as here, the action is brought by the Attorney General, it is not necessary to show that actual injury has resulted.[53]  North Carolina courts look

---

[49]Because the Court found liability on Counts XI and XIII as to REBFN and Martin Nossov, these defendants may be subject to an additional civil penalty pursuant to Minn. Stat. § 325F.71, subd. 2, for engaging in prohibited conduct by these statutes against senior citizens or disabled persons.  Because it is uncontroverted that REBFN sold grant-research services to Minnesota consumers 62 years of age and older, the provision applies to REBFN and Martin Nossov.

[50]N.C. Gen. Stat. § 75-1.1(a).

[51]*Rutledge v. High Point Reg'l Health Sys.*, 558 F. Supp. 2d 611, 619 (M.D.N.C. 2008).

[52]*Bernard v. Cent. Carolina Truck Sales, Inc.*, 314 S.E.2d 582, 584 (N.C. Ct. App. 1984).

[53]*North Carolina ex rel. Edmisten v. Challenge, Inc.*, 284 S.E.2d 333, 339 (N.C. Ct. App. 1981).

to decisions interpreting § 5(a) of the FTC Act for guidance in interpreting § 75-1.1.[54]

In Count XV, the State of North Carolina alleges that the North Carolina defendants violated the statute by engaging in the "advertising, marketing, promoting, offering for sale and sale of grant-related goods and services" that have a tendency or capacity to deceive or that are "misleading, false, and/or unsubstantiated" representations.  Given the Court's previous findings that REBFN violated section 5 of the FTC Act, and given North Carolina's similarity to the FTC Act, the Court finds that summary judgment is warranted against REBFN on this claim for the same reasons explained with respect to Counts II and III.

### 4.      Illinois: Counts XVII, and XVIII

The State of Illinois alleges the North Carolina defendants violated 815 I.L.C.S. 505/2. The statute states,

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.[55]

In an action brought by the Attorney General, a finding that defendant violated the Act, is a finding that defendant committed fraudulent or deceptive practices.[56]  The Attorney General

---

[54]*See, e.g.*, *Henderson v. U.S. Fid. & Guar. Co.*, 488 S.E.2d 234, 239 (N.C. 1997); *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 620 (N.C. 1980), *overruled on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988).

[55]815 Ill. Comp. Stat. Ann. 505/2.

[56]*Illinois ex rel. Fahner v. Am. Buyers Club, Inc.*, 450 N.E.2d 904, 906 (Ill. App. Ct. 1983).

must show that: "(1) a defendant is engaged in a trade or commerce, and (2) the defendant is engaged in unfair or deceptive acts or practices in the conduct of that trade or commerce."[57]  In construing § 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[58]

The claims in Counts XVII and XVIII are based on the same facts that support liability under the FTC Act in Counts II and III.  The Court incorporates by reference its analysis on those claims and finds that summary judgment should be granted in favor of plaintiff and against REBFN on Counts XVII and XVIII.

### C.   Telemarketing Rule: Counts IV and V

### 1.   Count IV

The Telemarketing and Consumer Fraud and Abuse Prevention Act directs the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."[59]  The TSR was promulgated pursuant to this directive and, in subsection 2, prohibits any seller or telemarketer from, among other things, "misrepresenting, directly or by implication, in the sale of goods or services. . . (iii) [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of the sales offer."[60]  A violation of the TSR constitutes a "deceptive act or practice" in violation

---

[57]*Illinois ex rel. Hartigan v. All Am. Aluminum & Const. Co.*, 524 N.E.2d 1067, 1071 (Ill. Ct. App. 1988).

[58]815 Ill. Comp. Stat. Ann. 505/2.

[59]15 U.S.C. § 6102(a)(1).

[60]16 C.F.R. § 310.3(a)(2)(iii).

of Section 5(a) of the FTC Act.[61]

In Count IV, all plaintiffs allege that the North Carolina Defendants misrepresented material aspects of the performance, efficacy, nature or central characteristics of the grant-related goods or services they marketed and sold, including the representations referenced in Count II and III, the FTC Act Counts.  The North Carolina Defendants respond with the same arguments made in opposition to the FTC Act claims, and further argue that they did not sell grant writing or grant coaching services, and that their consumers received exactly what they paid for—grant-research—or received a full refund.

As a threshold matter, the Court finds that REBFN is a telemarketer or seller as defined by the TSR.[62]  It is uncontroverted that REBFN sells grant-related goods and services by placing outbound telephone calls to consumers located throughout the United States.

The Court has already provided an extensive analysis of REBFN's materially false and unsubstantiated representations to consumers in conjunction with its rulings on the FTC Act claims and the various state law claims.  As discussed on those claims above, there is no genuine issue of material fact about whether REBFN made the 70% success rate representation and that it misrepresented to consumers that they were either guaranteed or very likely to receive grant money as a result of purchasing the grant-research services.  As already discussed in detail, these claims were likely to mislead an ordinary consumer, and they were material to the consumers' decisions to purchase REBFN's product.  The Court incorporates its discussion of those representations and finds for substantially the same reasons that summary judgment is appropriate in favor of plaintiffs on the TSR claim in Count IV.

---

[61] 15 U.S.C. § 6102(c).

[62] *See* 16 C.F.R. § 310.2(aa), (cc), (dd).

### 2. Count V

In Count V, all plaintiffs allege against Chapman a violation of the TSR for assisting and facilitating the Kansas Corporate Defendants under 16 C.F.R. § 310.3(b).  Under that section, "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule."  Substantial assistance requires "a connection between the assistance provided and the resulting violations of the core provisions of the TSR."[63]  Examples of substantial assistance provided by the FTC include:

> Providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered.[64]

Moreover, the FTC has provided the following business guidance with respect to assisting and facilitating under the TSR:

> It is a violation of the Rule to substantially assist a seller or telemarketer while knowing — or consciously avoiding knowing — that the seller or telemarketer is violating the Rule. Thus taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability. The help that a third-party provides must be more than casual or incidental dealing with a seller or telemarketer that is not

---

[63]*United States v. Dish Network, LLC*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009).

[64]61 Fed. Reg. 43842-01 (Aug. 23, 1995).

related to a violation of the Rule. For example, cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator.

Third parties who do business with sellers and telemarketers should be aware that their dealings may provide a factual basis to support an inference that they know — or deliberately remain ignorant of — the Rule violations of these sellers and telemarketers. For example, a third party who provides sellers or telemarketers with mailing lists, help in creating sales scripts or direct mail pieces, or any other substantial assistance while knowing or deliberately avoiding knowing that the seller or telemarketer is engaged in a Rule violation may be violating the Rule.[65]

Chapman declares that there is no case law interpreting the assisting and facilitating provision of the TSR. She urges that the Court look to case law construing criminal conspiracy liability instead. Chapman is incorrect to suggest that there is no law for the Court to turn to in applying this provision of the TSR. As discussed throughout this section, there is adequate guidance in the rule itself, the case law, and the FTC's interpretation of the rule, in order to decide the issues presented by these summary judgment motions. The Court finds no basis in the law to apply criminal conspiracy principles under these circumstances. The Court relies on the text of the TSR, the case law interpreting the Rule and the FTC's interpretation of the Rule.[66]

The Court finds no genuine issue of material fact that the Kansas Corporate Defendants violated the TSR, § 310.3(a). It is uncontroverted that the Kansas Defendants, in connection with telemarketing, made false claims to consumers that they would receive "guaranteed" government grants of at least $25,000; that the Kansas Defendants had achieved high success

---

[65]FTC, Complying with the Telemarketing Sales Rule (Feb. 2011), *at* http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule.

[66]The FTC's interpretation of the TSR is entitled to deference. *See Auer v. Robbins*, 519 U.S. 452, 457–58 (1997).

rates in obtaining grant money for consumers; and that consumers were likely to receive grant money if they bought the Kansas Defendants' goods or services.  These claims are false because the uncontroverted facts show that there was no substantiated basis for the claim that consumers received grant money at all, let alone the "guaranteed" $25,000 grants the Kansas Defendants promised.  The Kansas Defendants, therefore, have misrepresented, directly or indirectly, material aspects of the performance, efficacy, nature, or central characteristics of the grant-related goods or services they sold in violation of Section 310.3(a)(2)(iii) of the TSR.

The Court must, therefore, only determine if there is a genuine issue of material fact about whether Chapman provided "substantial assistance or support" to the Kansas Defendants and whether she knew or consciously avoided knowing that the Kansas Defendants engaged in a deceptive act or practice under the TSR.  With regard to her assistance to the Kansas Defendants, plaintiffs point to the following activities: she was the principal supplier of grant-research services for the entire scheme, she helped develop the questionnaire that the Kansas Defendants' telemarketers used to gather information from their customers, she co-authored the Grant Guide and sold her rights to one of the Kansas Defendants, she sought out consumer testimonials to further the scheme, she created the grant coaching workshop, she trained a sales floor on how to process grant-research requests from consumers, and she sought to assist the Kansas Defendants in expanding their operations to foreign countries.

It is uncontroverted that Chapman was the principal supplier of grant-research services, that she helped develop the questionnaire, that she authored the Grant Guide, and that she created the grant coaching workshop. With respect to these activities, Chapman urges that they were not related to the marketing and sale of the grant services.  The Court agrees that there is a genuine issue of material fact about whether these activities are connected to the Kansas

45

Defendants' violation.  The crux of the Kansas Defendants' violation is their representations of success in the face of a complete lack of substantiation that their customers actually received grant money.  While Chapman also failed to track consumers' success in obtaining grant money, her activities did not relate to the marketing of the product, but instead, the fulfillment of services.  Chapman contends that she was a third-party contractor who was not involved in the sale or marketing of the products, but merely produced the research results that she contends were legitimate.  There is a genuine issue of material fact about the legitimacy of these results. Plaintiffs point to Chapman's acknowledgment that only 2% of grants are available to individuals, as opposed to institutions.  Chapman attests that this 2% amounts to billions of dollars, which is why her expertise is so valuable.

Furthermore, some of Chapman's activities, or the extent thereof, are controverted; namely, whether Chapman sought out consumer testimonials, whether she trained a sales floor on how to process research requests, and whether she sought to assist the Kansas Defendants in expanding to a foreign market.  In fact, there is no evidence that Chapman sought to assist the Kansas Defendants in expanding their operations to foreign countries.  Chapman testified that she was asked to provide the Kansas Defendants for a quote on international research requests, which was never followed up on.  With respect to consumer testimonials, Chapman admits she worked with Chris Roehl to gather customer comments for GWI to use on the Internet.  But it is uncontroverted that neither Chapman nor her researchers spoke to consumers for whom they performed grant-research and writing services on behalf of the Kansas Defendants.  The Court finds that a  reasonable factfinder could determine that these activities do not amount to substantial assistance of the Kansas Defendants' core TSR violation.

The Court finds that summary judgment is neither warranted against Chapman nor the

FTC based on the substantial assistance element of the claim.  Chapman's activities could certainly be construed as similar to the types of activities the FTC and other courts have determined constitute substantial activity under the TSR.  Providing the grant-research services and creating the workshop are extremely similar to the FTC's example of providing lists of contacts to sellers or telemarketers that are members of vulnerable groups.

In *FTC v. Global Marketing Group, Inc.*,[67] the Middle District of Florida found that the defendant played a key role in the scheme, sufficient to establish substantial assistance, by processing the payments made to the telemarketers, reviewing, editing and approving the sales scripts, and handling customer complaints, as well as detailing the telemarketers returns.[68]  Here, the uncontroverted facts suggest that Chapman played a greater role than a mere independent third-party contractor to the Kansas Defendants.  She was in contact with them beyond preparing Research Results, providing them with assistance in responding to Attorney General inquiries, and drafting explanations the Kansas Defendants and others could provide to consumers about the content of the Research Results.  Yet, the defendant in *Global Marketing* arguably had a much greater participation in the telemarketing scheme at issue in that case.  There, the primary violators made misleading statements to consumers in order to induce them to buy their goods and services.  Activities that were found to constitute substantial assistance were incontrovertibly tied to the telemarketers' misrepresentations, such as reviewing, editing, and approving sales scripts.  The uncontroverted facts here show a less clear connection to the core TSR violation

---

[67]594 F. Supp. 2d 1281 (M.D. Fla. 2008).

[68]*Id.* at 1288.

than the facts in *Global Marketing*.[69]

There is controverted evidence here about the degree of Chapman's assistance with the marketing of the Kansas Defendants' grant-related services. The Court finds there is a genuine issue of material fact about whether Chapman's assistance to the Kansas Defendants was substantial—that there is a connection between her services and the core violations of the TSR, *i.e.* the guarantees of obtaining grant money. Accordingly, neither plaintiffs' nor Chapman's motion for summary judgment is granted on this basis.

The Court also finds there is a genuine issue of material fact with respect to Chapman's knowledge of the TSR violations. Plaintiffs contend that Chapman was aware even before she began providing grant-related services to the Kansas Defendants that at least one State attorney general had inquired into their business practices and that she assisted the Kansas Defendants in responding to inquiries from the Alaska and North Carolina Attorneys General. Despite this knowledge, Chapman did not ascertain why these inquiries were being made. Additionally, plaintiffs argue that Chapman failed to review or inquire about the marketing of her grant-related services by the Kansas Defendants. Because she knew that individuals qualified for such a small percentage of grants, plaintiffs allege she should have been alerted to the potential for marketing abuse.

---

[69]While the Court notes that two other federal cases relied on by plaintiffs offer guidance on this provision of the TSR, they were not decided on summary judgment, so the Court accords them little weight at this stage of the process. *United States v. Dish Network, LLC*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009) was decided on a motion to dismiss; therefore, that court merely found that the complaint stated a claim for relief. And in *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5149998 (S.D. Fla. Feb. 20, 2004), the Court found liability under the assisting and facilitating provision of the TSR only after a trial on the merits. Again, while these cases are instructive of the types of activities the FTC considers violative, they do not dictate a result in this case under a summary judgment standard that evaluates whether a genuine issue of material fact is present. Likewise, while the Court acknowledges that these activities are routinely included in the FTC's complaints, those complaints hold little weight with respect to the operative standard on this motion, that is, whether there is a genuine issue of material fact on this claim based on the summary judgment record in this case.

Chapman contends that she did not know about any attorney general investigation into the Kansas Defendants' business practices at the time she began her business relationship with them; but it is uncontroverted that Chapman knew sometime at the beginning of her business relationship with the Kansas Defendants that certain state attorneys general were making inquiries into their grant-related operations. It is also uncontroverted that Chapman assisted one or more of the Kansas Corporate Defendants in responding to inquiries from the Alaska Attorney General's office and from the North Carolina Attorney General's office. Chapman contends that these inquiries were limited to verifying that grants for individuals existed, which she claims she was able to provide because such grants do, in fact, exist. Again, the legitimacy and extent of grants for individuals is a genuine issue of material fact. Plaintiffs argue that the 2% figure of grants for individuals points to the illegitimacy of marketing grants for individuals, while Chapman contends that this 2% is significant, as it represents billions of dollars in grant money.

Plaintiffs also argue that Chapman should have reviewed the marketing materials used by the Kansas Defendants. It is uncontroverted that Chapman did not review these marketing materials and that she did not review the front-end telemarketing recordings or the telemarketing scripts that the Kansas Corporate Defendants used to induce consumers to purchase grant-research, -writing, or -coaching services. Plaintiffs also point to Chapman's conduct after the TRO was entered in this case, as evidence of her knowledge. After the TRO was entered, Chapman continued providing grant-research services to WPS and eventually, EMS. Chapman has not reviewed the marketing materials or telemarketing sales recordings or sales scripts that EMS uses to induce customers to purchase grant services. And up until September 2010, Chapman did not track whether consumers who purchase her grant-related services from EMS actually receive a grant.

49

While the Court agrees that Chapman's failure to review the marketing materials of these companies does not insulate Chapman from liability, it does create a genuine issue of material fact with respect to whether she knew, or reasonably should have known, of the Kansas Defendants' TSR violations.  Viewing the evidence in the light most favorable to Chapman, she was unaware of the Kansas Defendants' marketing methods, and was not made aware of consumer complaints except to the extent she was able to draft replacement results for those who did not qualify for results provided in the first instance

For all of the reasons explained above, the Court denies plaintiffs' motion for summary judgment as to defendant Chapman on Count V, and denies Chapman's motion for summary judgment on this claim.

###     E.        *Permanent Injunctive Relief*

Plaintiffs seek injunctive relief pursuant to section 13(b) of the FTC Act, which provides in part, that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  The statute provides the district court with authority to grant a permanent injunction against violations of the law as enforced by the FTC, as well as the authority to "grant any ancillary relief necessary to accomplish complete justice because [Congress] did not limit that traditional equitable power explicitly or by necessary and inescapable inference."[70]  The term "proper case" under the statute at the very least means a case where the FTC relies on a "straightforward violation of section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings."[71]  The

---

[70]*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988).

[71]*World Travel Vacation Brokers, Inc.*, 861 F.2d at 1028.

Court finds that this is a proper case under the statute.

The FTC seeks a permanent injunction against the North Carolina Defendants that includes, among other things, banning them from engaging in telemarketing, prohibiting them from making misrepresentations, and requiring them to substantiate claims in their business ventures going forward.  The FTC further seeks injunctive relief that requires certain compliance monitoring, recordkeeping and distribution obligations to enable plaintiffs to monitor defendants' compliance with the order.  Because the Court has found liability on the federal claims as to REBFN, it proceeds to consider whether injunctive relief is appropriate against REBFN and the Nossovs.  Because the Court has found a genuine issue of material fact regarding Chapman's liability under the TSR, discussion of permanent injunctive relief is premature.

### 1.    REBFN

When a defendant has ceased violating conduct, as in this case with REBFN, "the party seeking injunctive relief must demonstrate to the court 'that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'"[72]  In making this determination, the Court considers: "all the circumstances, including the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."[73]  In evaluating the "effectiveness of the discontinuance," the Court looks to whether the defendant has "the capacity to 'engage in similar

---

[72]*FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

[73]*Id.* (quotation omitted).

unfair acts or practices in the future.'"[74]

In seeking permanent injunctive relief against REBFN, plaintiffs point to its knowledge that the LPG mailings guaranteed $25,000 in government grants, that its customers were complaining in high numbers, and its receipt of inquiries from State attorneys general. Also, plaintiffs point to the evidence about REBFN's misrepresentations about the guaranteed or high likelihood of obtaining grants. Plaintiffs point to the fact that, even in the face of these complaints, REBFN continued to sell the grant-research without any further review of the Kansas Defendants' marketing materials. When they learned of certain states' concerns, REBFN discontinued sales in only those states. REBFN argues that injunctive relief is not warranted because it voluntarily refunded to consumers more than $1 million, that it is not a recidivist, and that it ceased its grant-related operations before the litigation commenced.

While the Court acknowledges REBFN's representations that it ceased its grant-related operations before this litigation commenced in August 2009, there is sufficient evidence to suggest that there is some cognizable danger of a recurrent violation. Plaintiffs have demonstrated that Martin Nossov knew as early as December 2008 that he did not want to continue his business relationship with the Kansas Defendants, believing defendant Blackman was deceitful. Yet, REBFN continued to telemarket the grant-research services for the Kansas Defendants through May 2009. Also, the evidence demonstrates that REBFN was sent investigative demand letters from State attorneys general. Instead of ceasing its activities altogether, REBFN merely stopped selling in the states of North Carolina, Minnesota, Kansas, and Missouri. While not evidence of recidivism in the sense that REBFN had been found to

---

[74]*Id.* (quoting *W.T. Grant Co.*, 345 U.S. at 633).

violate consumer fraud statutes in the past, this is predictive evidence that REBFN continued its misrepresentations surrounding the grant-related services, even in the fact of investigative inquiries and in the face of numerous consumer complaints.  Moreover, the Court finds that REBFN is in the business of telemarketing, which is a business that presents ample opportunity for future violations.  For all of these reasons, the Court finds that permanent injunctive relief is warranted against REBFN in this matter.

### 2.     Martin and Alicia Nossov

To obtain injunctive relief against an individual under § 13(b) for the acts of a business entity, the FTC first must show that the entity violated § 5.[75]  Then, the FTC must show that "the individual participated directly in the business entity's deceptive acts or practices, or had the authority to control them."[76]  The FTC argues that summary judgment and injunctive relief is warranted against both Martin and Alicia Nossov under these standards on the federal claims.

As described above, the Court grants summary judgment in favor of the FTC and against REBFN on both FTC Act counts and on the TSR claim.  In order for the Nossovs to be liable for injunctive relief, there must be no genuine issue of material fact that they either participated in the acts or had the authority to control REBFN.  The same facts that form the basis of the Court's ruling that plaintiffs' summary judgment motion is granted as to Martin Nossov and denied as to Alicia Nossov on the state law claims, control the analysis here.  There is ample uncontroverted evidence that Martin Nossov had authority to control REBFN.  There is a genuine issue of material fact about whether Alicia Nossov had authority to control REBFN.  Therefore, injunctive relief is appropriate as to Martin Nossov, but not as to Alicia Nossov.

---

[75]*FTC v. Freecom Comm'cns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005).

[76]*Id.*

### F.      Monetary Penalties

### 1.      REBFN

Section 13(b) of the FTC Act has also been interpreted as granting the Court authority to order restitution as ancillary relief.[77]  To obtain consumer redress against an individual (such as restitution), the FTC must show that consumers "actually relied on the entity's deceptive acts or practices to their detriment."[78]  To raise a presumption of reliance, the FTC must show: "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."[79]  The North Carolina Defendants do not refute that the FTC is able to establish reliance.  And the Court finds, as already discussed, that defendants made misrepresentations that were misleading to an ordinary consumer.  Some of these misrepresentations were made in conjunction with an REBFN sales script and were, therefore, widely disseminated leading to hundreds of sales by REBFN's own estimate.  Multiple consumers have testified that they relied on these misrepresentations to their detriment.

REBFN urges the Court to order disgorgement of profits, instead of gross revenue, as a less harsh remedy, arguing that restitution for sales conducted during the entire eighteen-month period during which REBFN worked with the Kansas Defendants would be unfair since the 70% success rate sales script was only used for five of those months and between 35 and 50% of its gross revenues were paid to NMR and GWI.  The FTC responds that the appropriate measure of

---

[77]*Id.* ("In cases where the FTC seeks injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief.") (citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468–69 (11th Cir. 1996); *FTC v. Pantron 1 Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)).

[78]*Id.*

[79]*Id.* at 1206.

monetary liability is the consumers' net losses, not the defendants' profits.  Indeed, the Tenth Circuit has held that gross receipts are an appropriate baseline measure of actual loss under section 13(b) of the FTC Act given the FTC's showing of reliance.[80]  It is uncontroverted that REBFN's gross sales for the grant services it sold on behalf of GWI was approximately $6.5 million.  REBFN refunded approximately $1 million of the $6.5 million it received in gross sales for the grant services it sold on behalf of GWI, resulting in a total consumer loss of $5.5 million.

"To accurately calculate the actual loss, the defendants must be allowed to put forth evidence showing that certain amounts should offset the sanctions assessed against them."[81]  In this case, REBFN fails to come forward with evidence that suggests the refund amount is incorrect, or that there are consumers who were "wholly satisfied with their purchases and thus suffered no damages."[82]  Moreover, the Court is unable to find that the gross receipts should be offset by the amount REBFN paid to GWI and NMR.  The FTC calculated the consumer loss based on what the consumers in this case lost from REBFN; they do not "receive anything greater than what was originally paid . . . ."[83]  "The fraud in the selling, not the value of the thing sold, is what entitles consumers to full refunds."[84]  The Court declines to adjust the gross revenue amount, which is uncontroverted, based on REBFN's profits.

REBFN further argues that the monetary award here is punitive.  But the Court agrees

---

[80]*FTC v. Kuykendall*, 371 F.3d 745, 765–66 (10th Cir. 2004) (discussing *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993)); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (collecting cases where courts award the full amount lost by consumers).

[81]*Kuykendall*, 371 F.3d at 766.

[82]*Id.*

[83]*Febre*, 128 F.3d at 536–37.

[84]*Kuykendall*, 371 F.3d at 766 (quotation omitted).

with the Seventh Circuit that "[p]unitive damages are damages awarded above and beyond what will compensate the victim for his losses," whereas the damages requested by the FTC here are "based upon what consumers lost."[85]   Accordingly, these are not punitive damages, but damages authorized by section 13(b) of the FTC Act.

### 2.      Martin Nossov

In order for Martin Nossov to be liable for monetary relief, the FTC must show that he had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."[86]

As already discussed, there is no genuine issue of material fact that Martin Nossov meets the knowledge requirement to be held individually liable for REBFN's FTC Act violations.  It is uncontroverted that Martin Nossov approved of the telemarketing scripts, failed to substantiate the representations made in the scripts he approved that were provided by the Kansas Defendants, and was aware that REBFN telemarketers were making claims during sales of guaranteed or 90% likelihood of receiving grants.  No reasonable factfinder could determine that there is a genuine issue of material fact about whether he approved or sanctioned REBFN's representations, as alleged in Counts II and III.  He also was aware of the LPG mailings and the fact that the $25,000 guarantees on these mailings helped generate the leads to which REBFN sold grant-research services.  He knew as early as December 2008 that Blackman was "deceitful," yet continued REBFN's business relationship with the Kansas Defendants for five more months.  For all of these reasons, the Court finds there is no genuine issue of material fact

---

[85]*Febre*, 128 F.3d at 536–37.

[86]*Kuykendall*, 371 F.3d at 766.

that Martin Nossov was either actually or constructively aware of the misrepresentations made by REBFN and should be held jointly and severally liable for REBFN's conduct.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiffs' Motion for Summary Judgment (Doc. 310) is **granted and part and denied** in part as follows: the motion is **granted** as to the REBFN and Martin Nossov on Counts II, III, IV, VII, IX, X, XI, XIII, XIV, XV, XVII, and XVIII.  The motion is **denied** as to the REBFN and Martin Nossov on Counts VIII and XII.  The motion is **denied** as to Chapman and Alicia Nossov.  The motion is **denied as moot** as to Justin Ely, WPS, and Aria.

**IT IS FURTHER ORDERED** that Defendant Chapman's Motion for Summary Judgment (Doc. 301) is **denied**.

**IT IS FURTHER ORDERED** that defendants Aria and WPS's Motion for Summary Judgment (Doc. 308) is **denied as moot**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for a permanent injunction is **grante**d.  Plaintiffs shall submit a proposed permanent injunction to the Court for REBFN and Martin Nossov.

Dated: July 26, 2011

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE