### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,    ) ) ) | |
|        Plaintiffs,    ) ) | |
|        vs.    ) ) | Case No. 09-4104-JAR |
| AFFILIATE STRATEGIES, INC., et al.,    ) ) | |
|        Defendants.    ) ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a consumer protection action against several individual and corporate defendants for their roles in marketing and selling to consumers grant-related goods and services upon allegedly false representations that the consumers were guaranteed or likely to receive grants and for follow-up based on the same or similar deceptive representations. The sole remaining claim in this case is brought by plaintiffs Federal Trade Commission ("FTC"), State of Kansas, State of North Carolina, State of Illinois, and State of Minnesota against defendant Meggie Chapman for a violation of the "assisting and facilitating" provision of the Telemarketing Sales Rule, 16 C.F.R. Part 310 ("TSR"). This claim was tried to the Court and this decision represents the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52.

## I.      Findings of Fact

Plaintiffs brought this action against the following defendants: Affiliate Strategies, Inc., Apex Holdings International, LLC, Answer Customers, LLC, Grant Writers Institute, LLC ("GWI"), and Landmark Publishing Group, LLC ("LPG") (collectively "the Kansas Corporate Defendants"); Brett Blackman, Jordan Sevy, and James Rulison (along with the Kansas

Corporate Defendants, "the Kansas Defendants"); Real Estate Buyers Financial Network, LLC

("REBFN"), Martin Nossov, and Alicia Nossov (collectively "the North Carolina Defendants");

Wealth Power Systems, LLC ("WPS"), Aria Financial LLC ("Aria"), and Justin Ely (collectively

"the Utah Defendants"); Direct Marketing Systems, Inc.; and Meggie Chapman.  Default

judgment has been entered against all of the Kansas Corporate Defendants and Direct Marketing

Systems, Inc.  The following defendants have settled with plaintiffs and stipulated permanent

injunctions and monetary judgments have been approved by the Court: Alicia Nossov, Brett

Blackman, Jordan Sevy, James Rulison, Justin Ely, WPS and Aria.  The Court granted summary

judgment in favor of plaintiffs on all of their claims against REBFN and Martin Nossov.  The

Court denied plaintiffs' motion for summary judgment against defendant Chapman and denied

defendant Chapman's motion for summary judgment.  Therefore, plaintiffs' sole remaining

claim against Chapman proceeded to trial.

This Court previously set forth a detailed statement of uncontroverted facts in ruling on

plaintiffs' and defendant's motions for summary judgment, which included several stipulated

facts that relate to the co-defendants in this matter who are either in default, or reached a

settlement with the plaintiffs.  The Court incorporates the stipulations set forth in the Pretrial

Order and in the summary judgment Memorandum and Order to the extent they are relevant and

are not explicitly recited herein.

### Kansas Defendants TSR Violations

The Kansas Corporate Defendants sold grant-related goods and services to consumers

throughout the United States in three stages: front-end sales, which entailed selling a book

entitled the "Professional Grant Writer" (the "Grant Guide"); middle-sales, which entailed

selling grant research services; and back-end sales, which entailed selling grant writing and/or coaching services.

LPG marketed the grant-related goods and services by mailing or causing to be mailed millions of direct marketing pieces to consumers throughout the United States, including but not limited to consumers in Illinois, Kansas, Minnesota and North Carolina, to induce consumers to purchase grant-related goods or services. LPG's direct marketing mail pieces advertised the availability of government grants. Many of LPG's direct marketing mail pieces sent to consumers contained the phrase: "You are Guaranteed a $25,000 Grant from the U.S. Government."

The direct marketing mail pieces contained toll-free numbers for consumers to call to obtain a grant. Consumers who called the toll-free numbers contained in LPG's direct marketing mail pieces were offered the opportunity to purchase the Grant Guide for $69 ($59 for the Grant Guide plus $10 for shipping and handling). When consumers called the toll-free numbers on the direct marketing mail pieces, consumers heard a recorded message (the "front-end recording") that included several representations that the caller was either guaranteed or likely to receive government grant money. These claims were unsubstantiated.

One or more of the Kansas Corporate Defendants contracted for the writing of, bought the copyrights to, and published the Grant Guide. The Grant Guide contained, in the first few pages, just after the testimonials, a statement that "grant writers have been able to produce a 70% success rate in receiving grant funding." None of the Kansas Defendants tracked whether the consumers who purchased their grant-related goods or services actually received grants. The 70% success rate claimed by the Kansas Defendants does not relate any of the defendants.

3

Instead, the success rate is the personal success rate achieved by Lynne Paeno, the author of the Grant Guide.  Paeno achieved this success rate through her independent work to obtain grant funding for school districts and non-profit organizations, not individual consumers.  Consumers from across the United States, including from Illinois, Kansas, Minnesota, and North Carolina, bought the Grant Guide from LPG.  The Kansas Defendants cannot identify any individual who received grant money as a result of purchasing the Grant Guide.

The Kansas Corporate Defendants used a list of those consumers who called about and/or purchased the Grant Guide as leads to sell grant research services and in turn, used a list of those consumers who purchased grant-research services as leads to sell grant writing and/or grant coaching services (the "Kansas Leads").  The telemarketing for the grant research services began after consumers purchased the Grant Guide, when they received a call either from GWI or an outside telemarketer hired by the Kansas Defendants.  GWI sold grant research, grant writing, and/or grant coaching services directly to the Kansas Leads throughout the United States, including but not limited to consumers in Illinois, Kansas, Minnesota and North Carolina.  GWI used telemarketing scripts to sell grant research, writing, and coaching services.  Many of GWI's middle-sales scripts contain the statement that the "Grant Writers Institute has achieved a 70% success rate with their past customers totaling more than $80 million in grant funds for their clients."  The Kansas Defendants represented to consumers that they were likely to receive grant money if they purchased the grant research services.  They charged consumers between $800 and $1100 for grant research services.

The Kansas Defendants used telemarketing sales scripts to sell the grant writing and grant coaching services.  They represented to consumers that they were guaranteed or likely to

receive a grant if they purchased grant writing or coaching services. The Kansas Defendants' telemarketing sales scripts also began by indicating that the consumer likely has no experience obtaining a grant, that defendants were the experts in this area, and that the consumer had a high chance of getting grant funding with defendants' help. The Kansas Defendants offered grant writing services for at least $265 per page and offered grant coaching services for as much as $1495.

There is no evidence that consumers who purchased the Kansas Defendants' grant research services, whether directly or through the North Carolina and Utah Defendants, received any grant money as a result of purchasing the grant research services. There is likewise no evidence that consumers who purchased the grant writing and grant coaching services received any grant money as a result of purchasing these services.

### *Fulfillment*

In order to fulfill the grant-related goods and services sold to consumers, the Kansas Corporate Defendants contracted with grant researchers and grant writers, including but not limited to Lynne Paeno and defendant Chapman. One or more of the Kansas Corporate Defendants contracted with Paeno in early September 2007 to write the Grant Guide, which was sold during the front-end stage of the sales process. Lynne Paeno subcontracted with Chapman to write portions of the Grant Guide, one of which focused on grants for individual consumers as opposed to non-profits and schools. Paeno has repudiated the Kansas Defendants' use of the Grant Guide because it was intended for use by non-profit organizations and school districts, not individual consumers.

Prior to performing grant research services for the Kansas Defendants, Chapman had not

performed any grant research for individual consumers. Her business had focused only on grant research and writing for schools and non-profits. She received no training on researching grants for individuals and the Kansas Defendants provided her with no guidance on how to conduct such research. Chapman understood that only 2% of grants are available to individuals, but understood that this percentage nonetheless represents billions of available dollars in grant money. Chapman contends that she obtained this information from a report she read.

Chapman did business as Meggie Chapman and Associates. Chapman provided fulfillment services to the Kansas Defendants by researching potential money sources for the consumers who purchased grant research services. She began performing grant research through Paeno in December 2007. In August 2008, the Kansas Defendants directly hired Chapman to fulfill the grant research services sold by them, the North Carolina Defendants, and the Utah Defendants. In exchange for purchasing grant research services, Chapman provided a completed list of potential money sources to the Kansas Defendants ("research results"); the Kansas Defendants passed along the research results document to the consumer.

Each research request included a questionnaire filled out by the sales person who contacted the consumer. Chapman helped develop this questionnaire, which the Kansas Defendants and their telemarketers used to collect information from consumers who purchase grant research services. Chapman provided limited training for the NMR sales floor on information needed to process research requests.[1] This training included the importance that the salespersons write legibly, an explanation of categories of research, the fact that there are no funds available for debt relief, and information about the research product.

---

[1]NMR is a telemarketer associated with the Kansas Defendants.

Chapman did not contact consumers to discuss any other issues that may affect their eligibility for certain grants.  Her project manager would screen each request to determine if it was legible and "viable," before it was assigned to a researcher.  Sometimes, Chapman would receive the cover letter sent to the consumer, along with that consumer's research request.  That cover letter requires the consumer to verify that amount to be charged and sign the document.  The letter provides:

> This Grant Search service offer is not a guarantee of receiving a grant and does not include writing the grant applications or educational training.  However, in the rare event that you don't meet the criteria for any grant applications, based on your profile, we will refund $790.00 and retain $205.00 as a processing fee.  To obtain this $790 refund, in the rare event that you don't meet the criteria for a single grant application or assistance program or low/no interest rate loan, based on your profile, the client must first notify us at the above address via certified mail and allow 30 days for refund.  Your Grant search is done from 1,000's of federal state, municipal and private organizations and will be completed within 3 to 4 weeks following our receipt of this signed and dated document.  The results of your search will be delivered to you via certified mail and will contain a list of grants you are eligible for with names of institutions, addresses, contact info, and your options. . . ."[2]

If Chapman learned that additional requirements existed for a grant provided in the research results that she was previously unaware of, she would provide replacement results.

Research results often included loans, contests, entitlement programs, and social welfare programs for which the consumer was not eligible or that did not fit the needs identified by the consumer.  Chapman provided talking points to the Kansas Defendants to explain to consumers why such non-grant items were included in their results.  According to Chapman, sometimes

---

[2]*E.g.*, Ex. PX58.

these funding opportunities were advantageous to grants because they had less restrictions and less reporting requirements.

Some of the funders included on research results were institutions that did not fund individuals consumers, or that did not provide monetary funding, or that did not exist, or that requested that their names be removed from lists given by defendants to consumers.  Chapman maintained a "no funders list," which was a list of funders she determined should not be used for individuals.  It was Chapman's policy to rely on information provided by funders on their website, or on their IRS form 990, which were released to the public two years after the grants were awarded.  If Chapman found out later that a funder had additional restrictions, she would add it to the no funder list. This list includes a number of notations next to certain funders such as, "as per Brett," or "okay for research, not for writing (final decision pending)."  By April 2008, Chapman began sending letters to funders asking for specific information regarding grant criteria because she had "found that the 990 form does not always indicate the current priorities or eligibility."[3]  At least two organizations separately contacted GWI to complain that its research results had generated a large number of applications from individuals who do not qualify for their grants.[4]

Chapman would sometimes provide "replacement results" for no charge if it turned out that a funder provided in a consumer's research results did not exist, or had additional requirements that she had been unaware of at the time she included it in the research results.  However, Chapman had no direct contact with consumers.  Instead, a project manager for one of

---

[3]Ex. PX109.

[4]Exs. PX115, PX116.

the Kansas Defendants, or their telemarketers, would request that Chapman complete replacement results.

At the beginning of their business relationship with the Kansas Defendants, Paeno and Chapman received many research requests for grants to pay off debt.  At first, they were unsure about whether such grants were available and believed they had located foundations that provided such grants.  However, as time went on, they discovered that no such grants existed and Chapman and Paeno made the joint decision that they would not accept such applications.  Eventually, by May 2008, they began sending these research requests back to the Kansas Defendants when they requested grants for debt reduction.  Chapman did not ask why the Kansas Defendants and their telemarketers were encouraging callers to apply for debt reduction grants.

Around June 2008, Paeno decided she did not want to provide grant-related services for individuals.  She understood that the Kansas Defendants would eventually start providing grant-related services for schools and non-profits, which did not appear to be developing.  Paeno told Chapman that she did not enjoy working on individual grant requests because it was hard to manage the writers, the clients were difficult, and the writers were dealing directly with the clients.  Chapman indicated to Paeno that she wanted to continue to do grant research for the Kansas Defendants.  Paeno told Chapman that she was sure the Kansas Defendants would want Chapman to continue, so long as "you feel good about the types of applications that they're—you know, keep on them, make sure that they're not marketing, you know, in a way that you're getting these requests that are not viable, is what we always said, and so she did it. She continued doing them."[5]

_____

[5]Ex. PX160 at 68.

The Kansas Defendants contracted with Chapman for the fulfillment of the grant writing beginning in November 2008. Chapman fulfilled the grant writing services by drafting or completing proposals and/or applications on behalf of consumers to the potential money sources that were identified in the research results she created for the consumers. Chapman employed grant researchers to help her prepare grant proposals for consumers who purchased the Kansas Defendants' grant writing services. Chapman also trained her mother and sister to help her with the grant research when she moved on to grant writing.

Chapman began providing grant coaching services in the summer 2008. The Kansas Defendants asked Chapman to prepare a workshop for their customers. She prepared a handout and audio sessions teaching consumers from start to finish how to find and apply for grants.

Chapman responded to specific inquiries from two attorneys general regarding the Kansas Defendants' grant-related services. The Alaska Attorney General asked for a list of grants that could be awarded to individuals towards the beginning of Chapman's business relationship with the Kansas Defendants; Chapman put together a list of grants for which individuals could apply. Later, in April 2009, Chapman put together a similar list after an inquiry was made by the North Carolina Attorney General. Ed Sammarco of ASI sent Chapman an email explaining that the "North Carolina Attorney General's Office operates under the assumption that the grant-related programs geared to individuals are scams. . . . [S]he has asked for the names and contact information of specific grant funding sources that award grants for the following purposes: emergency debt relief, utility bills, first time home purchases and home repairs."[6]  In addition, Chapman was aware that the Kansas Attorney General had required the

---

[6]Ex. PX123.

Kansas Defendants to change their marketing materials.  And one of ASI's defense attorneys contacted Chapman to verify that actual researchers were conducting the grant research.  Despite these inquiries, Chapman never reviewed the Kansas Defendants' marketing materials, telemarketing scripts, or recordings of telemarketers conversations with consumers.

Chapman neither tracked whether any of the purchasing consumers ever received a grant nor asked the Kansas Defendants for substantiation or confirmation that consumers received grants after purchasing the grant-related goods and services.  Chapman knew that the Kansas Defendants did not track whether any of the consumers who purchased the grant-related goods and services actually received a grant.  Numerous consumers did not receive any grant money as a result of purchasing the Kansas Defendants' grant-related goods and services.

In addition to fulfillment services, Chapman provided other forms of assistance to the Kansas Defendants.  She prepared for the Kansas Defendants draft samples and a quote to prepare a newsletter and website content in order to expand and repackage ASI's business.  She also drafted a lengthy explanation for Jordan Sevy about contests and why they were included in the research results.  She "wrote it for the target audience," explaining the "new trend" of contests and sweepstakes, which "are all considered grants!"[7]  Sevy told Chapman that he wanted to include this explanation in the research results that the Kansas Defendants sent to consumers.

In February 2009, the Kansas Defendants were considering expanding to grant-related services for non-profits and educational entities.  Chapman emailed the Kansas Defendants a list of talking points developed for a conference call.  In this email, she states that she has "been

---

[7]Ex. PX121.

brainstorming ways that we can expand as well as repackage what we are currently doing to appeal to all parties."[8]   After Chapman had been working with ASI for a period of time, Jordan Sevy asked Chapman to put together an estimate or a quote of what her company would charge for international customers.  Chapman came up with an idea for the Kansas Defendants to sponsor a quarterly grant contest in order to generate consumer leads for their grant-related goods and services and for other business models engaged in by the Kansas Defendants.

Between late 2007 and July 2009, Chapman provided research services to over 8000 consumers.  She has no documentation on whether any of these consumers received a grant.  Yet, Chapman admits that she collected several positive testimonials from consumers, which she documented in an email to the Kansas Defendants in February 2009.  At the time the Original Complaint was filed in this case, approximately 80–90% of Chapman's business related to grant fulfillment services was provided on behalf of the Kansas Defendants.  Chapman and/or Meggie Chapman and Associates received compensation from one or more Kansas Defendants to provide grant research and/or grant writing and/or grant-coaching services to consumers.  She received $75 for each coaching workshop sold.  Chapman received $300 for the first five pages and $35 per page for each additional page of grant writing.  Chapman received $125 for each grant research order she fulfilled, which gradually increased to $160 per research result in August 2008.  According to Chapman's invoices, she received $1,682,950 from the Kansas Defendants in exchange for providing fulfillment services to consumers who purchased grant-related services from the Kansas Defendants or the North Carolina or Utah Defendants.

### *Activity Subsequent to the TRO*

---

[8]Ex. PX115.

This case was originally filed on July 20, 2009, by the FTC and the States of Kansas, Minnesota, and North Carolina. The Court issued a Temporary Restraining Order ("TRO") against the Kansas-based defendants on July 24, 2009, which, among other features, prohibited their on-going misrepresentations, appointed a Receiver over the Kansas Corporate Defendants, and imposed a freeze on the corporate assets.[9] On September 1, 2009, the Court entered a Stipulated Preliminary Injunction that continued the relief granted in the TRO.[10] On December 1, 2009, the Court granted the original plaintiffs' Motion to Amend the Complaint. The (First) Amended Complaint added the State of Illinois as a plaintiff and Chapman, the Utah Defendants, and Direct Marketing Systems as defendants. Plaintiffs filed the Second Amended Complaint (the "Complaint") on June 21, 2010.

Even though Chapman was not yet a party to this action in July 2009, she received notice that the Original Complaint was filed and notice of the TRO. Chapman filed a claim with the Receiver for amounts still owed to her as of July 24, 2009, in excess of $200,000.

Soon after, Justin Ely asked Chapman to continue providing grant fulfillment services for individual consumers on behalf of WPS, Innovative Research Group ("IRG"), and Life Change Solutions ("LCS"), and she agreed to do so. Chapman did not research Ely or his background, but eventually learned that he had been sued previously by the FTC. Chapman fulfilled grant research and grant writing for these entities, and Ely paid her for these services. Beginning in August 2009, Chapman began working for WPS, IRG, and LCS directly and stopped working with Ely. She never asked to review these entities' marketing materials or telemarketing sales

---

[9]Doc. 28.

[10]Doc. 78.

scripts. After WPS was added as a defendant, Chapman began providing grant-related

fulfillment services to individual consumers who purchased such services from EMS, an entity

which she knew was owned by the same individuals who owned WPS. She did not review

EMS's marketing materials or telemarketing scripts. Chapman did not track whether any of the

consumers who purchased her grant-related services from IRG, LCS, WPS, or EMS actually

received a grant, although EMS had an attorney on staff who assured her that its marketing

materials were legitimate.

## II.    Analysis and Conclusions of Law

The Court has subject matter jurisdiction under 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c),

and 6105(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345. Defendant Chapman has conducted

business in this District and the Court properly exercised personal jurisdiction over her. Venue

properly rests with this Court.

The Telemarketing and Consumer Fraud and Abuse Prevention Act directs the FTC to

"prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive

telemarketing acts or practices."[11] The TSR was promulgated pursuant to this directive and, in

subsection 2, prohibits any seller or telemarketer from, among other things, "misrepresenting,

directly or by implication, in the sale of goods or services. . . (iii) [a]ny material aspect of the

performance, efficacy, nature, or central characteristics of goods or services that are the subject

of the sales offer."[12] A violation of the TSR constitutes a "deceptive act or practice" in violation

---

[11]15 U.S.C. § 6102(a)(1).

[12]16 C.F.R. § 310.3(a)(2)(iii).

of Section 5(a) of the FTC Act.[13]

In Count V, all plaintiffs allege against Chapman a violation of the TSR for assisting and facilitating the Kansas Corporate Defendants under 16 C.F.R. § 310.3(b).  Under that section, "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule."  Substantial assistance requires "a connection between the assistance provided and the resulting violations of the core provisions of the TSR."[14]  Examples of substantial assistance provided by the FTC include:

> Providing lists of contacts to a seller or telemarketer that identify persons over the age of 55, persons who have bad credit histories, or persons who have been victimized previously by deceptive telemarketing or direct sales; providing any certificate or coupon which may later be exchanged for travel related services; providing any script, advertising, brochure, promotional material, or direct marketing piece used in telemarketing; or providing an appraisal or valuation of a good or service sold through telemarketing when such an appraisal or valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered.[15]

Moreover, the FTC has provided the following business guidance with respect to assisting and facilitating under the TSR:

> It is a violation of the Rule to substantially assist a seller or telemarketer while knowing — or consciously avoiding knowing — that the seller or telemarketer is violating the Rule. Thus taking deliberate steps to ensure one's own ignorance of a seller or

---

[13]15 U.S.C. § 6102(c), 57a(d)(3).

[14]*United States v. Dish Network, LLC*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009).

[15]61 Fed. Reg. 43842-01 (Aug. 23, 1995).

telemarketer's Rule violations is an ineffective strategy to avoid liability. The help that a third-party provides must be more than casual or incidental dealing with a seller or telemarketer that is not related to a violation of the Rule. For example, cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be enough to support liability as an assistor or facilitator.

Third parties who do business with sellers and telemarketers should be aware that their dealings may provide a factual basis to support an inference that they know — or deliberately remain ignorant of — the Rule violations of these sellers and telemarketers. For example, a third party who provides sellers or telemarketers with mailing lists, help in creating sales scripts or direct mail pieces, or any other substantial assistance while knowing or deliberately avoiding knowing that the seller or telemarketer is engaged in a Rule violation may be violating the Rule.[16]

There is no question that the Kansas Defendants, in connection with telemarketing, made false claims to consumers that they would receive "guaranteed" government grants of at least $25,000; that the Kansas Defendants had achieved high success rates in obtaining grant money for consumers; and that consumers were likely to receive grant money if they bought the Kansas Defendants' goods or services.  These claims are false because the evidence is clear that there was no substantiated basis for the claim that consumers received grant money at all, let alone the "guaranteed" $25,000 grants the Kansas Defendants promised.  The Kansas Defendants, therefore, have misrepresented, directly or indirectly, material aspects of the performance, efficacy, nature, or central characteristics of the grant-related goods or services they sold in violation of Section 310.3(a)(2)(iii) of the TSR.

The Court must, therefore, only determine whether Chapman provided "substantial

---

[16]FTC, Complying with the Telemarketing Sales Rule (Feb. 2011), *at* http://business.ftc.gov/documents/ bus27-complying-telemarketing-sales-rule.

assistance or support" to the Kansas Defendants and whether she knew or consciously avoided

knowing that the Kansas Defendants engaged in a deceptive act or practice under the TSR.  For

the reasons set forth in detail below, the Court finds that Chapman both provided substantial

assistance and support, and knew or consciously avoided knowing that the Kansas Defendants

engaged in a deceptive act or practice under the TSR.

      **1.**    **Substantial Assistance**

The Kansas Defendants violated the TSR by representing guaranteed success, or at least a

high likelihood of success, in the face of a complete lack of substantiation that their customers

actually received grant money.  While Chapman also failed to track consumers' success in

obtaining grant money, her activities did not relate to the marketing of the product, but instead,

the fulfillment of services.  Because Chapman did not directly participate in the marketing

portion of the grant scheme, she contends that she may not be held liable under the TSR.

Despite the fact that Chapman did not participate in the marketing of her grant research,

writing, and coaching, the Court finds that she substantially assisted the Kansas Defendants'

TSR violation.  Chapman did not provide incidental services to the Kansas Defendants.  The

Kansas Defendants' TSR violation is based on marketing of Chapman's products.  As Chapman

testified, she was providing, at least by the end of 2008, the vast majority if not all of the

research fulfillment for the Kansas Defendants.  Chapman fulfilled grant research, writing, and

coaching requests for consumers who were the targets of the Kansas Defendants'

misrepresentations.  The Court finds that Chapman's role cannot be considered incidental;

indeed, her fulfillment services were essential to the Kansas Defendants' scheme.  Chapman's

role was similar to the FTC's example in its commentary on the TSR of "an appraisal or

valuation has no reasonable basis in fact or cannot be substantiated at the time it is rendered."
Chapman provided the products and services that formed the basis of the Kansas Defendants'
misrepresentations, which the Court deems substantial assistance.  And the valuation she
provided of her services could not be substantiated.

Chapman further assisted the Kansas Defendants by providing services beyond
fulfillment.  She provided them with justifications and explanations about the grant research and
writing results when consumers complained.  For example, when consumers complained that the
research results included contests, sweepstakes, and assistance programs, the Kansas Defendants
asked Chapman to draft an explanation to include in the research results about why such
programs should be considered grants.  Also, Chapman responded to two attorney general
inquiries about the legitimacy of the Kansas Defendants' grant scheme.  She provided a list of
grants available to individuals for the states of Alaska and North Carolina.

In her talking points email to the Kansas Defendants, she states that she has "been
brainstorming ways that we can expand as well as repackage what we are currently doing to
appeal to all parties."[17]  After Chapman had been working with ASI for a period of time, Sevy
asked Chapman to put together a quote for international customers.  Chapman prepared a quote,
but the scheme never did expand internationally.  Chapman also came up with an idea for the
Kansas Defendants to sponsor a quarterly grant contest in order to generate consumer leads for
their grant-related goods and services and for other business models engaged in by the Kansas
Defendants.  Even though these proposals and drafts ultimately may not have been used by the
Kansas Defendants, they demonstrate that Chapman provided more than fulfillment services for

---

[17]Ex. PX115 (emphasis added).

the Kansas Defendants and provide strong circumstantial evidence that she was an integral part of their scheme.

Defendant argues that her services were unrelated to marketing and had independent value because the evidence shows that multiple sources do exist for grants to individuals.[18] Accordingly, she argues that there is no connection between her services and the Kansas Defendants' core TSR violations.  The Court disagrees.  Chapman is not required to directly participate in marketing in order to be liable under the assisting and facilitating provision of the TSR.  The TSR only requires that Chapman substantially assist or facilitate the Kansas Defendants' rule violation.  The Court finds that even though Chapman did not directly participate in the marketing of her research and writing, she provided research and writing services for more than 8000 individual consumers, services that proved extremely profitable to the defendants but provided no demonstrable success to consumers seeking grant money.  Chapman's services were necessary in order for the Kansas Defendants' scheme to continue.

Moreover, while Chapman has provided some evidence that grants existed for individuals, the evidence at trial suggested that such grants were few and far between.  Plaintiffs submitted a representative sample of consumer complaints stating that they did not qualify for the grants, contests, and sweepstakes provided to them in Chapman's research results.  And grant funders complained that they were receiving large amounts of applications from consumers referred to them by GWI, despite the fact that the applicants did not qualify for those grants.  Chapman steadfastly relied on information obtained from the IRS 990 forms for funders, which

_____

[18]Defendant suggests that plaintiffs decision not to join Paeno as a defendant in this matter somehow impacts the Court's analysis.  Paeno's assistance is not before the Court, and the Court will not second-guess plaintiffs' decision not to join this party as a defendant.  The Court limits its analysis to Chapman's activities and whether she is liable under the assisting and facilitating provision of the TSR.

were not published until two years after the grants were awarded.

And finally, Chapman's insistence that billions of dollars in grant money is available to individuals is not credible.  Despite citing this statistic in her letters to funders requesting more information about their applicant criteria, and despite repeatedly citing this statistic in support of her activities in this case, she is unable to point the Court to the source of this statistic.  The Court finds that there is strong circumstantial evidence that Chapman, while an accomplished grant services professional with respect to non-profit and educational funding, could not translate her success to the individual consumer market.  When funders balked and consumers complained, Chapman dug in rather than admit that her newfound income stream was based on shaky statistics and superficial research.  For all of the reasons set forth, the Court finds by a preponderance of the evidence that Chapman's activities substantially assisted the Kansas Defendants' TSR violation.

### 2.  Knowledge

The Court also must find that Chapman knew or consciously avoided knowing that the Kansas Defendants engaged in deceptive acts or practices under the TSR.  There was ample evidence at trial to support this finding.  First, Chapman knew of several attorney general inquiries into the Kansas Defendants' marketing practices.  She provided a list of individual grants for the Alaska Attorney General early in her business relationship with the Kansas Defendants.  The Court finds that this should have been a "red flag" for Chapman to at least investigate the Kansas Defendants' marketing practices.  Chapman knew that the Kansas Defendants used telemarketers to sell her services and knew that the Kansas Attorney General had requested that they change their marketing practices.  Yet, she never asked to see the Kansas

Defendants' marketing materials nor their telemarketing sales scripts.  The attorney general inquiries essentially suggested that Chapman was providing research results for consumers that were not viable.  At this time, Chapman was new to the business of researching grants targeting individuals and lacked the experience to be able to confidently ignore such an inquiry as relating to marketing alone.  Chapman also received a request from one of the Kansas Defendants' attorneys asking for the names of researchers because they wanted to make sure it was being conducted by "actual people."  Certainly, by the time Chapman received the North Carolina Attorney General's inquiry in April 2009, she was placed on notice that either her research results were faulty or the Kansas Defendants were inappropriately marketing her research results.  Either way, the Court finds that by wholly ignoring these inquiries and assisting the Kansas Defendants in responding to them, Chapman consciously avoided knowing that the Kansas Defendants engaged in deceptive acts or practices under the TSR.

There was other evidence presented at trial to support a finding that Chapman knew or consciously avoided knowing of the Kansas Defendants' misrepresentations.  Chapman was familiar with the Grant Guide, where the 70% success rate representation was made, and she knew that the Kansas Defendants could not substantiate any success rate because neither the Kansas Defendants nor Chapman tracked consumers success.  There is no evidence in the record that any consumer ever received a grant as a result of Chapman's services.  In light of the fact that Chapman provided her services to over 8000 individuals and declined to track their success in actually obtaining grants, the Court does not find credible Chapman's claimed ignorance of the Kansas Defendants' activities.

The Court is also persuaded by Paeno's deposition testimony that she counseled

Chapman at the time she ceased providing grant-related services to the Kansas Defendants that Chapman should be vigilant about monitoring the Kansas Defendants' marketing activities. This suggests that Chapman had knowledge as early as the summer 2008 that the Kansas Defendants may have been violating the TSR. The cover letter included in some of the research requests also suggests that Chapman knew about the assurances the Kansas Defendants made to consumers about the research results. Chapman testified that she sometimes received the cover letter the consumers are required to sign, which contain claims that it is rare for a consumer not to qualify for grants listed in the research results, and that the research results "will contain a list of grants you are eligible for . . . ."

The no funders list is further circumstantial evidence that Chapman was aware of the gap between the assurances made by the telemarketers and the products she generated. There were numerous entries on this list, many of which included notations such as "as per Brett," referring to defendant Blackmun. Also, Chapman testified that once she and Paeno determined that individual grants were not available for debt reduction, they continued to receive large numbers of grant requests from the Kansas Defendants and their telemarketers for such grants. Again, this should have placed Chapman on notice that the telemarketers were not accurately relaying to consumers the types of grants that were available, and their likelihood of receiving such grants.

Finally, Chapman testified at trial about several grant sources included in her research results that did not exist or had requirements that consumers did not meet. The Court finds that the consumer and funder complaints should have made Chapman aware of the Kansas Defendants' violative behavior. Instead, Chapman insisted on relying on outdated information and a statistic that individual grants comprise 2% of the grant market; a statistic that she was

22

Case 5:09-cv-04104-RDR-KGS   Document 422   Filed 09/16/11   Page 23 of 26

unable to substantiate at trial.  All of this evidence convinces the Court, by a preponderance of the evidence, that Chapman either knew or consciously avoided knowing that the Kansas Defendants' were violating the TSR by misrepresenting that Chapman's goods and services either guaranteed or made it more likely that they would obtain significant amounts of grant money.

### 3.    Remedies

Under 15 U.S.C. § 57b(b), the FTC Act provides that in cases involving rule violations with respect to unfair or deceptive acts:

> The court . . . shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

Plaintiffs urge the Court to award damages in the amount of the gross revenue collected by Chapman in the course of assisting and facilitating the Kansas Defendants.  The Court agrees that the gross revenue collected by Chapman in the course of assisting and facilitating the Kansas Defendants is appropriate.[19]  Plaintiffs have submitted sufficient evidence that Chapman collected $1,682,950 during the course of her business relationship with the Kansas Defendants. Damages are awarded to plaintiffs in the amount of $1,682,950.

---

[19]*See FTC v. Kuykendall*, 371 F.3d 745, 765–66 (10th Cir. 2004) (discussing *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993)); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (collecting cases where courts award the full amount lost by consumers).

23

Plaintiffs also seek a permanent injunction to enjoin Chapman from engaging, participating, or assisting others in the advertising, promoting, telemarketing, offering for sale, selling or distributing any "Money-Making Opportunities" to individuals, such as grant or funding opportunities.  It further seeks a permanent injunction enjoining defendant from engaging in or assisting others in violating the TSR.

Pursuant to section 13(b) of the FTC Act, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."[20]  The statute provides the district court with authority to grant a permanent injunction against violations of the law as enforced by the FTC, as well as the authority to "grant any ancillary relief necessary to accomplish complete justice because [Congress] did not limit that traditional equitable power explicitly or by necessary and inescapable inference."[21]  The term "proper case" under the statute at the very least means a case where the FTC relies on a "straightforward violation of section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings."[22]  The Court finds that this is a proper case under the statute.

In order to issue a permanent injunction, the Court must only determine if there is "some cognizable danger of a recurrent violation, something more than the mere possibility which serves to keep the case alive."[23]  The Court easily finds evidence in the record that there is some

---

[20]15 U.S.C. § 53(b).

[21]*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988).

[22]*World Travel Vacation Brokers, Inc.*, 861 F.2d at 1028.

[23]*United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Metzler v. IBP, Inc.*, 127 F.3d 959, 964 (10th Cir. 1997).

24

cognizable danger of a recurrent violation because Chapman continued, after the Kansas Defendants assets were frozen and turned over to the receiver, to conduct grant research and writing for individual consumers with different telemarketers.  Despite her awareness of the TRO in this case and the allegations against the Kansas Defendants, Chapman continued to consciously avoid knowing whether these other companies' conduct violated the TSR by misrepresenting success rates of obtaining the grants that she researched or for which she wrote applications.  The Court finds that a permanent injunction is necessary to prevent future violations of the TSR by prohibiting Chapman from engaging, participating, or assisting others in the advertising, promoting, telemarketing, offering for sale, selling, or distributing any "Money-Making Opportunities" to individuals, such as grant or funding opportunities, and from engaging in or assisting others in violating the TSR.  Plaintiffs shall prepare a proposed final judgment and permanent injunction to the Court in accordance with this opinion.

**III.   Conclusion**

Based on the above stated findings of fact and conclusions of law, the Court finds that judgment should be entered in favor of plaintiffs and against defendant Chapman on Count V, for violating the TSR, 16 C.F.R. § 310.3(b).  Plaintiffs are awarded damages in the amount of $1,682,950.  Chapman shall be permanently enjoined from engaging, participating, or assisting others in the advertising, promoting, telemarketing, offering for sale, selling or distributing any grant-related services to individuals, such as grant or funding opportunities, and from engaging in or assisting others in violating the TSR.  Defendant's oral motion for judgment as a matter of law at the close of plaintiffs' case is denied.  Plaintiffs shall prepare a proposed final judgment and permanent injunction to the Court in accordance with this opinion.

**IT IS SO ORDERED.**

Dated: <u>September 16, 2011</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
